**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
            apersinger@bursor.com

*Attorneys for Plaintiffs*
*(additional counsel appears on signature page)*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ADAMSON, MICHAL CLARK, JOHN LLEWELLYN, ANDREA STANLEY and JACKIE WARNCKE, on Behalf of Themselves and all Others Similarly Situated,<br><br>                         Plaintiffs,<br><br>     v.<br><br>ADT, LLC d/b/a ADT SECURITY SERVICES and DOES 1 through 10, inclusive,<br><br>                         Defendant. | Civil Action No. 2:12-cv-10558-DMG-FMO<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT ADT LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:  Hon. Dolly M. Gee<br><br>Hearing Date:  April 4, 2014<br>Time: 2:00 p.m.<br>Courtroom:  7 |

# PUBLIC VERSION

# TABLE OF CONTENTS

**PAGE(S)**

I.  INTRODUCTION .................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 2

    A.  John Adamson ........................................................................ 3

    B.  Michal Clark .......................................................................... 3

    C.  Jackie Warncke ...................................................................... 3

    D.  Andrea Stanley ....................................................................... 4

    E.  John Llewellyn ....................................................................... 4

III.  THE SUMMARY JUDGMENT STANDARD ................................. 4

IV.  ADT'S CTC IS NOT AN ALTERNATIVE MEANS OF
    PERFORMANCE ............................................................................. 5

    A.  ADT Fails to Meet Its Burden to Prove Its CTC Is an
        Alternative Means of Performance ...................................... 10

V.  NONE OF PLAINTIFFS' CLAIMS FAIL AS A MATTER OF
    LAW ............................................................................................... 11

    A.  The Voluntary Payment Defense Is Not Available ............ 11

    B.  Plaintiffs Adamson and Clark Did Not Voluntarily Pay
        CTCs to ADT ...................................................................... 13

    C.  Plaintiffs Adamson and Clark Did Not Pay CTCs with Full
        Knowledge of the Facts ...................................................... 15

    D.  Plaintiffs Stanley and Warncke Have Standing .................. 16

    E.  Plaintiff Clark Also Has Standing ...................................... 19

VI.  SUMMARY JUDGMENT ON THE TILA CLAIM SHOULD
    BE DENIED ................................................................................... 21

    A.  Plaintiff Llewellyn's TILA Claim Is Not Barred by the
        Statute of Limitations ......................................................... 21

    B.  Plaintiff Llewellyn's TILA Claim Is Not Barred by the
        Voluntary Payment Doctrine .............................................. 23

    C.  ADT's Increased Fee Provision Is Unlawful ..................... 24

VII.  CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Aho v. AmeriCredit Fin. Servs., Inc.*,
2011 WL 2292810 (S.D. Cal. June 8, 2011) ........................................ 18

*Am. Oil Serv. v. Hope Oil Co.*,
194 Cal. App. 2d 581 (1961) ................................................................. 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................ 5

*Barrows v. Chase Manhattan Mortgage Corp.*,
465 F. Supp. 2d 347 (D.N.J. 2006) ...................................................... 19

*Bickle v. City of Piedmont*,
45 Cal. App. 4th 313 (1995) ................................................................. 15

*Blank v. Borden*,
11 Cal. 3d 963 (1974) .................................................................. 6, 7, 10

*Buck v. Dahlgren*,
23 Cal. App. 3d 779 (1972) .................................................................. 12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................ 4

*CMG Realty of Conn., Inc. v. Colonnade One Ltd. P'ship*,
36 Conn. App. 653 (1995) ...................................................................... 9

*Colapinto v. Esquire Deposition Services, LLC*,
2011 WL 913251 (C.D. Cal. Mar. 8, 2011) ......................................... 19

*Delano Farms Co. v. California Table Grape Commission*,
546 F. Supp. 2d 859 (E.D. Cal. 2008) .................................................. 18

*Doral Bank PR v. Federal Home Loan Mortgage Corp.*,
2010 WL 3984667 (E.D.Va. Oct. 7, 2010) ............................................ 8

*Eisel v. Midwest BankCentre*,
230 S.W.3d 335 (Mo. 2007) ................................................................. 12

*Elliano v. Assurance Co. of Am.*,
3 Cal. App. 3d 446 (1970) .................................................................... 11

*Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*,
9 Cal. 3d 731 (1973) .................................................................. 2, 5, 8, 10

*Gutierrez v. Wells Fargo & Co.*,
　622 F. Supp. 2d 946 (N.D. Cal. 2009) ............................................................ 12, 23

*Hargis v. Access Capital Funding, LLC*,
　674 F.3d 783 (8th Cir. 2012) .......................................................................... 18

*Hitz v. First Interstate Bank*,
　38 Cal. App. 4th 274 (1995) ........................................................................... 6

*Huch v. Charter Communications, Inc.*,
　290 S.W. 3d 721 (Mo. 2009) .......................................................................... 12

*Hutchison v. Yahoo! Inc.*,
　396 F. App'x. 331 (9th Cir. 2010) ................................................................. 8, 10

*In re Cellphone Termination Fee Cases*,
　186 Cal. App. 4th 1380 (2010) ....................................................................... 17

*In re Cellphone Termination Fee Cases*,
　193 Cal. App. 4th 298 (2011) ......................................................................... 5

*In re Cellphone Termination Fee Cases*,
　2008 WL 2332971 (June 9, 2008) ................................................................. 9, 17

*Indoor Billboard/Wash. Inc. v. Integra Telecom of Wash., Inc.*,
　162 Wash.2d 59 (2007) .................................................................................. 12

*James v. UMG Recording, Inc.*,
　2012 WL 1376977 (N.D. Cal. Apr. 19, 2012) .............................................. 24

*Lopez v. Washington Mutual Bank FA*,
　302 F.3d 900 (9th Cir. 2002) .......................................................................... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986) ....................................................................................... 5

*Mau v. L.A. Fitness Int'l, LLC*,
　749 F. Supp. 2d 845 (N.D. Ill. 2010) ........................................................... 9, 10

*Maxwell v. Griswold*,
　51 U.S. 242 (1850) ......................................................................................... 13, 14

*Minnick v. Clearwire U.S. LLC*,
　174 Wash. 2d 443 (2012) ............................................................................... 8, 10

*Morris v. Redwood Empire Bancorp*,
　128 Cal. App. 4th 1305 (2005) ....................................................................... 7

*Mourning v. Family Publ'ns Serv., Inc.*,
   411 U.S. 356 (1973) ................................................................24

*Neal v. Residential Credit Solutions, Inc.*,
   2013 WL 428675 (D. Md. Feb. 1, 2013) ...............................18

*Parino v. BidRack, Inc.*,
   838 F. Supp. 2d 900 (N.D. Cal. Sept. 26, 2011) .........11, 13, 14

*Plascencia v. Lending 1st Mortgage*,
   583 F. Supp. 2d 1090 (N.D. Cal. 2008) ..................................23

*Pratt v. Smart Corp.*,
   968 S.W.2d 868 (Tenn. Ct. App. 1997) .................................13

*Ramirez v. Smart Corp.*,
   371 Ill. App. 3d 797 (2007) ...................................................12

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010) ...............................................18

*Salling v. Budget Rent-A-Car Systems, Inc.*,
   672 F.3d 442 (6th Cir. 2012) .................................................15

*Schneider v. Verizon Internet Services, Inc.*,
   400 F. App'x. 136 (9th Cir. 2010) .....................................8, 10

*Sobel v. Hertz Corp.*,
   698 F. Supp. 2d 1218 (D. Nev. 2010) ....................................12

*Spivey v. Adaptive Marketing LLC*,
   622 F.3d 816 (7th Cir. 2010) ...........................................14, 16

*Steinman v. Malamed*,
   185 Cal. App. 4th 1550 (2010) ........................................13, 24

*Stock v. Meek*,
   35 Cal.2d 809 (1950) .............................................................12

*Townsend v. Nat'l Arbitration Forum, Inc.*,
   2012 WL 12736 (C.D. Cal. Jan. 4, 2012) ..............................18

*Western Gulf Oil Co. v. Title Ins. & Trust Co.*,
   92 Cal. App. 2d 257 (1949) ...................................................13

*White v. Trans Union, LLC*,
   462 F. Supp. 2d 1079 (C.D. Cal. 2006) .................................18

*Yang v. Home Loan Funding, Inc.*,

    2010 WL 670958 (E.D. Cal. Feb. 22, 2010) ....................................................21, 22

*Young v. Hoagland*,

    212 Cal. 426 (1931) ...................................................................................... 13, 14

**STATUTES**

15 U.S.C. § 1601 ................................................................................................ 1

15 U.S.C. § 1635(a), (b) ...................................................................................21

15 U.S.C. § 1640(e) ..........................................................................................21

Cal. Bus. & Prof. Code §17200 ........................................................................ 1

Cal. Civ. Code § 1635 ......................................................................................21

Cal. Civ. Code § 1670 ........................................................................................5

Cal. Civ. Code § 1671 ...............................................................................passim

Cal. Civ. Code § 1750 ........................................................................................1

Md. Code Com. Law §13-101 ...........................................................................1

**TREATISES**

Charles McCormick, *Handbook on the Law Of Damages* §154 (1935) .....................6

Justin Sweet, *Liquidated Damages In California*, 60 Cal. L. Rev. 84 (1972) .............5

# I.  INTRODUCTION

Plaintiffs Adamson, Clark, Stanley and Warncke specifically allege that the "contract termination charges"[1] charged by ADT are unconscionable and unenforceable penalties under California Civil Code §1671, and that they violate the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq* (the "UCL"), the Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq.* (the "CLRA"), and the Maryland Consumer Protection Act, Md. Code Com. Law §§13-101 *et seq.* (the "MCPA").  Plaintiff Llewellyn alleges that ADT's agreements are credit transactions subject to the Truth In Lending Act, 15 U.S.C. §§1601 *et seq.* ("TILA") and that ADT failed to comply with the requirements of TILA.

ADT's position in its motion is a classic "Catch 22."  ADT argues that neither a customer who pays a CTC nor a customer who refuses to pay a CTC can bring claims against ADT for its unlawful early termination fees; if ADT's argument is accepted than *no one* can effectively prosecute this claim.  Under ADT's reasoning, if a class member is charged a CTC and pays it, the voluntary payment doctrine prevents her from suing under Cal. Civ. Code §1671, which specifically permits actions to void consumer penalties and forecloses any right to obtain relief under the UCL, CLRA and the MCPA.  But class members who are charged CTCs and do not pay them, according to ADT, cannot bring an action under the UCL, CLRA, or the MCPA because they have not suffered an "actual injury."  If accepted by the Court, ADT's arguments would effectively repeal the consumer protection statutes at issue and leave Plaintiffs and the Class without any remedy to redress the assessment, enforcement, and collection of unlawful contractual penalties that violate Cal. Civ. Code. §1671, the UCL, CLRA and the MCPA.

ADT further argues that its CTC of 75% of the remaining balance of its fixed-term contracts is not really a liquidated damages provision to compensate for breach, but is instead an alternative means of performing the contract.  But ADT's CTC

---

[1] Referred to herein as "CTCs," early termination fees, or "ETFs."

provision clearly contemplates the event of default or breach by the customer.   As a result, ADT's CTC "cannot escape examination in light of pertinent rules relative to the liquidation of damages."  *See Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731, 737-38 (1973).  Thus, to characterize ADT's CTC as an alternative means of performance "would be to condone a result which, although directly prohibited by the Legislature, may nevertheless be indirectly accomplished through the imagination of inventive minds." *Id.*

ADT also erroneously claims that Plaintiffs' TILA claims are time-barred and that ADT's sale of alarm equipment and monitoring services is not a "credit" sale as a matter of law.  The TILA claims are timely and material issues of fact remain in dispute.  For these reasons, and the reasons set forth below, ADT's motion for summary judgment on all claims should be denied in its entirety.

## II.  STATEMENT OF FACTS

ADT requires that its customers abide by agreements distributed on preprinted forms presented on a "take it or leave it" basis.  Undisputed Fact ("UF") 46.  All of ADT's current agreements are two to three year term contracts that contain a CTC of 75% of the remaining balance.  UF 47.  ADT's CTC is a penalty charge that ADT instituted to reduce customer attrition, increase revenue, compete with other security companies, and to streamline administrative procedures.  Porpora Dep. 54:10-55:4

### A.     John Adamson

After he signed a three-year term contract with ADT, in June 2012, Mr. Adamson's system broke down in January 2013.  UF 48.  Because his equipment was not effective, Mr. Adamson wanted to add additional door sensors but ADT refused to provide him with a code to enable him to do so himself.  *Id.*  The price to install the monitors was far in excess of what it would have cost him to purchase additional monitors.  *Id.*  In April 2013, Mr. Adamson cancelled his contract with ADT and paid a contract termination charge in the amount of $500.51.  UF Nos. 3, 4.

### B.     Michal Clark

Plaintiff Clark's mother, Wilma Clark, was an ADT customer who had to cancel her ADT service because her declining health forced her to move to assisted living.[2]   UF 50.  Plaintiff Clark moved to Monrovia, California to care for his mother at the end of her life.  UF 51.  While he lived with her, Mr. Clark regularly contacted ADT to resolve problems with Ms. Clark's ADT services.  UF 52.  After he cancelled his mother's service on her behalf, his mother paid a CTC.  *See* Clark Dep. 36:20-21, 37:21-22, 38:1-3, 39:1-16, 41:1-7, 130:16-21, 133:18-19, 134:11-15, Fisher Ex. C; *see also* UF 50.

### C.     Jackie Warncke

Jackie Warncke signed a three-year contract with Broadview, a predecessor of ADT, in May 2010 for her Maryland residence.  UF 31.  In 2011, ADT told her that her alarm system was unreliable and that she needed to install more equipment.  Warncke Dep. 62:6-19, 64:6-13, 50:15-19, Fisher Ex. D.  She declined.  *Id.* at 50:11-21.  ADT informed her that it was therefore going to terminate her service.  *Id.* at 48:13-22, 66:3-7; *see also id.* at 67:20-21, 64:25-65:5, 46:21-47:7.  Ms. Warncke did not pay the $712.09 CTC that ADT charged her because she felt it was unfair to have to pay for services that ADT failed to provide.  *Id.* at 13:24-14:1, 19:13-21, 21:16-23, 64:25-65:5 *see also* UF 32.  Ms. Warncke, did, however,

---

[2] Plaintiff Michal Clark is his mother's successor in interest in this action.

wrongfully pay for the services she did not receive because ADT automatically deducted those charges from her bank account.  *Id*. at 21:5-23, 81:15-19.[3]

### D.     Andrea Stanley

Andrea Stanley signed a three-year contract with ADT.  *See* Slattery Ex. R. After losing her job, Ms. Stanley terminated her ADT service to reduce her monthly expenditures.  Stanley Dep. 29:6-13, Fisher Ex. E.  Based on her discussion with ADT, she believed ADT had waived any termination fee.  *Id.* at 31:12-17.  Months later, Ms. Stanley learned she owed a CTC from her credit report.  *Id.* at 32:5-10.

### E.     John Llewellyn

Mr. Llewellyn has had alarm monitoring services with ADT for many years. UF 58.  His alarm monitoring service malfunctioned in 2011 and he contacted ADT. Llewellyn Dep. 12:18-25, Fisher Ex. F.  ADT advised Mr. Llewellyn that he had a choice: pay a large up-front fee for labor and equipment or agree to a new three-year contract that would cover the installation of new equipment.  UF 59.  On August 11, 2011, Mr. Llewellyn entered into a new three-year contract.  Llewellyn Dep. 13:8-10, Fisher Ex. F; Slattery Ex. K.  In October 2012, Mr. Llewellyn received a notice of rate increase from ADT.  UF 26.  The letter advised Mr. Llewellyn that ADT had increased its monthly fees and Llewellyn felt it was a "fait accompli" that he had to accept.  Llewellyn Dep. 62:8- 63:6, Fisher Ex. F.

### III.  THE SUMMARY JUDGMENT STANDARD

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden has been met, Rule 56(c) requires that the nonmoving party designate specific facts showing that there is a genuine issue.  *Id.* at 324.  A dispute

---

[3]  In addition, on August 2, 2011, ADT withdrew payment for services during August directly from her bank account. Warncke Dep. 81:15-19, Fisher Ex. D.  Because ADT terminated her service in August she paid for the remaining month of service although she did not receive any service.  *Id.* at 13:2-8.

is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quotations omitted).

## IV.  ADT'S CTC IS NOT AN ALTERNATIVE MEANS OF PERFORMANCE

ADT argues that its CTC of 75 percent of the remaining monthly fees is "not subject to Cal. Civ. Code §1671 (d)" because it "is an alternative means of performance as a matter of law." Mot. at 10.  But the law in California has long recognized that characterizations of contract terms as "alternative performance" are likely to be "devices for avoiding limitations on penalty clauses." Justin Sweet, *Liquidated Damages In California*, 60 Cal. L. Rev. 84, 94 (1972), Fisher Ex. G. Thus, courts have held that a contractual provision will be deemed an alternative method of performance ***only if it is not a remedy for breach of contract.*** *See Garrett*, 9 Cal. 3d at 737-38; *see also Lowe v. Mass. Mut. Life Ins. Co.*, 54 Cal. App. 3d 718, 731-32 (1976).  In *Garrett*, the court explained:

> Thus when it is manifest that a contract expressed to be performed in the alternative **is in fact a contract contemplating but a single, definite performance with an additional charge contingent on the breach of that performance, the provision cannot escape examination in light of pertinent rules relative to the liquidation of damages**.

*Garrett*, 9 Cal. 3d at 738 (citations omitted, emphasis added).  To hold otherwise, "would be to condone a result which, although directly prohibited by the Legislature, may nevertheless be indirectly accomplished through the imagination of inventive minds." *Id.* at 737.  Indeed, "the legislative declarations of §§1670 and 1671 would be completely frustrated."[4]  *Id.*  In deciding whether a contract provides for

---

[4] Under §1671(c) and (d), a liquidated damages clause in a consumer contract is presumed "void." *See In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 322 (2011).  Thus, ADT must show that its CTCs are valid. *Id.*  ADT must show that (1) "fixing the amount of actual damages [was] impracticable" and (2) that

1   alternative performance or imposes liquidated damages for a breach, the Court must
2   "look to substance rather than form in determining the 'true function and character'"
3   of the parties' arrangement.  *Blank v. Borden*, 11 Cal. 3d 963, 970 (1974) (quoting
4   *Garrett*, 9 Cal. 3d at 735-7).  The analysis depends on the mutual intentions of the
5   parties at the time the contract was entered into, and does not depend on later
6   circumstances such as who terminated the contract, why it was terminated, or even
7   whether it was terminated.  *See Garrett*, 9 Cal. 3d at 738.

8       To determine whether a clause provides for an alternative means of
9   performance rather than for liquidated damages, courts evaluate whether a plaintiff
10   was presented with a "rational choice" at the time of contracting.  *See Blank v.*
11   *Borden*, 11 Cal. 3d at 971.  An examination of prior cases where courts have applied
12   a "rational choice" analysis to find that a contract provision provided for an
13   alternative means of performance unambiguously demonstrates that ADT's CTC is
14   *not* an alternative means of performance.

15       For instance, in *Blank*, the court held that a right-to-sell provision did not
16   constitute a penalty in violation of Cal. Civ. Code §1671 because it included "the
17   element of rational choice," noting that the owner could have made the "realistic and
18   rational choice" not to sell the property and to pay the agreed upon sum instead.  *Id.*
19   at 971.  Under a "rational choice" analysis, the question for the Court to determine is
20   "whether a reasonable man might look forward to either choice as a reasonable
21   possibility …."  *Id.* at 971 n.7 (quoting Charles McCormick, *Handbook on the Law*
22   *Of Damages* §154, at 617-18 (1935)).  "[W]hile an alternative promise to pay money
23   when it presents a conceivable choice is valid, yet, if a contract is made by which a
24   party engages himself either to do a certain act or to pay some amount which at the

25

26   the liquidated damages amount "represent[s] the result of a reasonable endeavor by
    the parties to estimate a fair average compensation for any loss …"  *Hitz v. First*
27   *Interstate Bank*, 38 Cal. App. 4th 274, 288 (1995).  Because ADT cannot meet either
28   prong of the two part test, ADT's CTC is void.

time of the contract no one would have considered an eligible alternative, the alternative promise to pay is unenforceable as a penalty." *Id.*; *see also id.* at 970 ("Here, however, we do not find that the contract before us is of the indicated character [of a liquidated damage clause].  Its terms in no sense contemplate a 'default' or 'breach' of an obligation by the owner upon whose occurrence payment is to be made…."); *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1315 (2005) (contract termination charge found to be an alternative performance provision rather than a liquidated damages provision where, unlike here, the contract had no fixed term: "Morris notes the lack of any specified duration in the merchant agreement makes payment of the termination fee inevitable.  But this very inevitability takes the provision out of the realm of liquidated damages, which by definition are assessed only upon a breach.").

In evaluating whether a contract provides for alternative performance, courts must also consider whether or not the subscriber contracts were adhesion contracts. In *Blank*, the fact that the broker contract at issue had been negotiated at arm's length by parties with equal bargaining power was held to be a key reason to enforce the clause:

> [I]t is important to recognize that we are not here concerned with a situation wherein the party who seeks to enforce the clause enjoyed a vastly superior bargaining position at the time the contract was entered into.  On the contrary, the contract before us was one which was freely negotiated by parties dealing at arm's length. While **contracts having characteristics of adhesion must be carefully scrutinized in order to insure that provisions therein which speak in terms of alternative performance but in fact exact a penalty are not enforced**, we believe that in circumstances such as those before us interference with party autonomy is less justified.

*Id.* at 972 (emphasis added, citations omitted).  Here, on the other hand, it is undisputed that the subscriber contracts were contracts of adhesion – standardized form contracts imposed and drafted by the party with superior bargaining strength, which relegates to the other party only the opportunity to either adhere to the contract or reject it.  UF 46.

ADT's reliance on *Minnick v. Clearwire U.S. LLC*, 174 Wash. 2d 443 (2012), *Schneider v. Verizon Internet Services, Inc.*, 400 F. App'x. 136 (9th Cir. 2010), and *Hutchison v. Yahoo! Inc.*, 396 F. App'x. 331 (9th Cir. 2010) for the proposition that ADT's CTC is an alternative means of performance is clearly misplaced.  In each of those cases, at the time the plaintiffs entered into the contracts at issue, they were all presented with a rational choice between a discounted term contract with a CTC, and a month-to-month contract with no discount and no CTC.  *Minnick*, 174 Wash. 2d at 446 (plaintiffs had a choice "between a month-to-month contract with no obligations beyond the monthly subscription charge and a fixed-term contract that has a discounted monthly subscription charge" as well as an ETF; plaintiffs "all **chose** the fixed-term contract, for either one or two years." (emphasis added)); *Hutchison*, 396 F. App'x. at 333 (same); *Schneider*, 400 F. App'x. at 138 (same).  This factual distinction is critical, yet ignored by ADT.  Indeed, because Plaintiffs (and all Class members) were not presented with any such choice, all of ADT's cases are inapposite.

Thus, ADT's contention that "[e]ach [opinion] answered the question by examining the choice the customer faced between two alternatives at the time of contracting, and finding the flexibility offered by either serving the term of the contract or paying the ETF offered the customers a reasonable and rational choice" is misplaced and misleading.  *See* Mot. at 12.  The *only* relevant inquiry is whether a customer was presented with a "rational choice" *at the time of contracting*.  *See Garrett*, 9 Cal. 3d at 738; *Minnick*, 174 Wash. 2d at 446; *Schneider*, 400 F. App'x. at 138; *Hutchison*, 396 F. App'x. at 333; *see also Doral Bank PR v. Federal Home Loan Mortgage Corp.*, 2010 WL 3984667, at *7 n.15 (E.D.Va. Oct. 7, 2010) ("In both [*Hutchison* and *Schneider*], the ETF was a single lump sum that had a direct relationship and close proximity to the costs the customers avoided under an ***alternative contractual arrangement***" (emphasis added)).  Contrary to ADT's

misguided contention, the critical inquiry is *not* whether a customer had the so-called "flexibility" to remain in the contract or pay a CTC. *Id.*

ADT also disregards the analysis of whether a customer had a "rational choice" at the time of contracting all together, and leaps to the illogical conclusion that "[w]hat these precedents must mean is that a contract termination charge that *always* is materially *less* (25 percent less) than the remaining payments due under the contract must be an alternative means of performance." *See* Mot. at 12 (emphasis in original). ADT's characterization cannot be. Indeed, in *In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th at 328, the court rejected the defendant's arguments that an ETF provision in a cell phone contract provided for alternative performance, and found that a $200 ETF constituted an unlawful penalty. *See also CMG Realty of Conn., Inc. v. Colonnade One Ltd. P'ship*, 36 Conn. App. 653, 663 (1995) (ETF was not an alternative performance provision because "[t]he 'right' to terminate under the circumstances here is legally indistinguishable from the power to breach a contract posed by any party whose contractual duties are executory."). Similarly, as the court explained in *Mau v. L.A. Fitness Int'l, LLC*, 749 F. Supp. 2d 845, 849 (N.D. Ill. 2010):

> Fundamentally an alternative-performance analysis is conducted in response to the suggestion of an "attempt to disguise a provision for a penalty that purports to make payment of the amount an alternative performance under the contract" (Restatement (Second) of Contracts § 356 cmt. c (1981) .... Courts should expect to find non-punitive forms of alternative performance clauses, as opposed to traditional liquidated damage clauses, where "the primary object of an alternative contract is performance, and it thus looks to a continuation of the relationship between the parties, rather than to its termination" (24 Williston on Contracts § 65:7 (Richard Lord, ed., 4th ed. 2010)). This exposition of the alternative-performance analysis makes clear that an analysis is not really applicable here. First, by definition there was and is no expectation of a continuing relationship between Mau and Fitness – exactly the opposite is true. Mau simply wanted to end his contract .... Surely the situation can be classified as nonperformance ... rather than alternative performance.

Here, because payment of the CTC is at best classified as nonperformance rather than alternative performance, the Court should not be persuaded by ADT's attempt to disguise its improper CTC penalty as an alternative means of performance.  *See* Mot. at 12.

### A.  ADT Fails to Meet Its Burden to Prove Its CTC Is an Alternative Means of Performance

An examination of ADT's CTC shows that it "is in fact a contract contemplating but a single, definite performance with an additional charge contingent on the breach of that performance."  *See Garrett*, 9 Cal. 3d at 738.  In practice, the CTC is clearly a remedial measure to be invoked upon breach because ADT's adhesion contracts require that customers sign up for a two to three years and pay the monthly charges for the entire term of the agreement.  *See* UF 47.  Unlike in *Minnick*, *Hutchison*, and *Schneider*, ADT customers were never given the option to choose between a term contract of two or three years with a CTC and a month-to-month contract without a CTC.  UFs 46, 47; *see, e.g.*, Porpora Dep. 58:5-12, Fisher Ex. A.  Indeed, ADT's two to three year contracts of adhesion provided no choice at all.  As such, ADT does not give its customers a rational choice with respect to the CTC.  The fact that ADT's agreements were adhesion contracts also compels the rejection of the defense of alternative performance.  *Blank*, 11 Cal. 3d at 972.

Moreover, the fact that ADT adopted the CTC to reduce attrition, compete with other security companies, and streamline administrative procedures further demonstrates that the CTC is not an alternative means of performance.  Porpora Dep.

███████████████████████████████████████████

███████████████████████████████████████████

Fisher Ex. B; *see, e.g.*, *Mau*, 749 F. Supp. 2d at 849 (denying motion for summary judgment: "Without question the [ETF] was a means of putting pressure on Mau to adhere to the original terms of the agreement instead of cancelling the Agreement and refusing to pay Fitness for the use of its personal training service.").  This is

borne out by the very low collection rates for the CTC.  Porpora Dep. 131:18-21,
Fisher Ex. A.  Accordingly, ADT's attempt to disguise its CTC as a provision for
alternative means of performance must fail.[5]

## V.  NONE OF PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW

### A.     The Voluntary Payment Defense Is Not Available

ADT also contends that Plaintiffs' claims are barred by the voluntary payment
doctrine.  Mot. at 16-17.  Not so.  Civil Code §1671(d) is plainly designed to protect
consumers from excessive unlawful liquidated damages provisions.  According to
ADT, the payment of an unlawful penalty would deprive a plaintiff of her ability
bring an action to recover it.  *See Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 908-
09 (N.D. Cal. Sept. 26, 2011) (declining to find that CLRA, UCL, and FAL claims
were barred by voluntary payment).  If ADT's reasoning were applied here, the
statutory claims asserted by Plaintiffs would be rendered meaningless and Plaintiffs
would be deprived of any and all consumer remedies to redress the enforcement of
contractual penalties that the Legislature has declared to be unlawful.  Indeed, the
defenses of waiver, voluntary payment, and estoppel are equitable defenses applied
under principles of justice to protect an innocent party or "rescue justice in situations
where the party seeking to take refuge behind the bar of a statute of limitations or a
contractual limitation of the same nature, has conducted himself in such a manner
that to apply the bar in his favor would shock the conscience of equity."  *See Elliano
v. Assurance Co. of Am.*, 3 Cal. App. 3d 446, 450 (1970) (citations omitted).

For these reasons, courts routinely (and rightly) hold that the voluntary
payment doctrine is not a permissible defense where its application would be

---

[5] ADT concedes that its "legacy" contracts with a "flat fee" CTC existed during the
class period.  Mot. at 12, n.2.  ADT conclusorily argues that its "flat fee" CTC is an
alternative means of performance.  *Id.*  For the same reasons discussed herein, the
flat fee CTC cannot be considered an alternative means of performance.  Moreover,
ADT has *not* moved for summary judgment on the grounds that the 100% CTC
provides for alternative performance, but acknowledges that Ms. Warncke's contract
has just such a provision.  Mot. at 9.

contrary to state consumer protection statutes.  For example, in *Huch v. Charter Communications, Inc.*, 290 S.W. 3d 721, 725 (Mo. 2009), the Missouri Supreme Court stated that because the fundamental purpose of the Merchandising Practices Act ("Act") is to protect consumers, "certain legal principles are not available to defeat claims authorized by the act."  As the court stated in *Huch*, the legislature, having enacted "paternalistic legislation designed to protect those that could not otherwise protect themselves, ... would not want [those] protections ... to be waived by those deemed in need of protection." *Id.* at 727.  "***To allow [the defendant] to avoid liability for [an] unfair practice through the voluntary payment doctrine would nullify the protections of the act and be contrary to the intent of the legislature***." *Id.* (emphasis added).  As such, the court held that the voluntary payment doctrine was not a defense to a violation of the Act. *Id.*

The core rationale, analysis, and holding of *Huch* are not only well-reasoned, but also widely accepted.  Courts around the country have issued rulings consistent with the reasoning in *Huch* in similar consumer cases. *See Sobel v. Hertz Corp.*, 698 F. Supp. 2d 1218, 1221-24 (D. Nev. 2010) (following the reasoning of *Huch II* and the cases in line with *Huch II* because the legislature enacted the Deceptive Trade Practice Act primarily for the protection of consumers); *Stock v. Meek*, 35 Cal.2d 809, 817 (1950) ("The theory of [the Usury Law] is that society benefits by the prohibition of loans at excessive interest rates, even though both parties are willing to negotiate them.  Accordingly, 'voluntary' payments of interest do not waive the rights of the payors"); *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 955-56 (N.D. Cal. 2009) (refusing to apply voluntary payment doctrine where class claims were based in fraud); *see also Buck v. Dahlgren*, 23 Cal. App. 3d 779 (1972); *Indoor Billboard/Wash. Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash.2d 59, 87 (2007); *Eisel v. Midwest BankCentre*, 230 S.W.3d 335, 339-40 (Mo. 2007); *Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797, 812 (2007); *Pratt v. Smart Corp.*, 968 S.W.2d 868, 872

(Tenn. Ct. App. 1997).  Because application of the voluntary payment doctrine would deprive Plaintiffs of the very remedies the Legislature authorized to deter the enforcement of penalties in the consumer context, the Court should find that the doctrine cannot be invoked as a defense to Plaintiffs' consumer protection claims.

**B.      Plaintiffs Adamson and Clark Did Not Voluntarily Pay CTCs to ADT**

Even if the voluntary payment doctrine applied, and it does not, Plaintiffs' payments were not in any sense "voluntary."  ADT admits that the doctrine only bars the recovery of money that was *voluntarily* paid *with full knowledge of the facts*. Mot. at 16; *see also, e.g.*, *Parino*, 838 F. Supp. 2d at 908-09 (voluntary payment inapplicable because "payment to her credit card company so that she could stay in good standing with creditors while pursuing this action would not bar her claim").

As explained by the California Supreme Court:

> Among the instances of the relaxation of the strictness of the original common law [voluntary payment] rule is the case of payments constrained by business exigencies, that is payments of illegal charges or exactions under apprehension on the part of the payers of being stopped in their business if money is not paid.  *It has been stated that the general rule with regard to duress of this character is that where, by reason of the peculiar facts a reasonably prudent man finds that in order to preserve his property or protect his business interests it is necessary to make a payment of money which he does not owe and which in equity and good conscience the receiver should not retain, he may recover it.*  Upon this same subject we find the following statement in 20 California Jurisprudence, page 964: "The underlying principle (that money paid under compulsion may be recovered) is said to be that, *by the performance of or threat to perform some unlawful act whereby plaintiff will suffer loss, the defendant has induced the plaintiff, under circumstances sufficient to control the action of a reasonable man, to pay money which he would not otherwise have paid*."

*Young v. Hoagland*, 212 Cal. 426, 430-31 (1931) (citations omitted, emphasis added); *see also Western Gulf Oil Co. v. Title Ins. & Trust Co.*, 92 Cal. App. 2d 257, 265 (1949) ("Payments of illegal claims enforced by duress, coercion or compulsion, when the payor has no other adequate remedy to avoid it, will be deemed to have been made involuntarily and may be recovered…."); *Steinman v. Malamed*, 185 Cal. App. 4th 1550, 1558 (2010); *Maxwell v. Griswold*, 51 U.S. 242 (1850) ("It suffices,

1    if the payment is caused on the one part by an illegal demand, and made on the other

2    part reluctantly and in consequence of that illegality ….  The payment of the

3    increased duties thus caused was wrongfully imposed on the importer, and was

4    submitted to merely as a choice of evils.").

5        Here, Plaintiffs had no adequate remedy to avoid payment of the CTC.  If

6    Plaintiffs did not pay ADT's unlawful fee, the unpaid fee would be passed to a

7    collections agency and would negatively impact their credit.  *See* Warncke Dep.

8    17:16-18, Fisher Ex. D; Stanley Dep. 32:5-10, Fisher Ex. E; McDevitt Dep. 45:12-20

9    ███████████████████████████████████████████████, Fisher

10   Ex. H, UF 60; *see also* UF 49.   As the court explained in *Parino*, the voluntary

11   payment doctrine did not apply to a plaintiff's consumer claims because "payment to

12   her credit card company so that she could stay in good standing with creditors while

13   pursuing this action would not bar her claim."  *Parino*, 838 F. Supp. 2d at 909.

14   Thus, the circumstances here were "sufficient to control the action of a reasonable

15   man, to pay money which he would not otherwise have paid."  *See Young*, 212 Cal.

16   at 430-31.  In other words, Plaintiffs "submitted" to payment of the "wrongfully

17   imposed" fees "merely as a choice of evils."  *See Maxwell*, 51 U.S. at 256.

18        Thus, ADT's cited cases are distinguishable.  In *Lopez v. Washington Mutual

19   Bank FA*, 302 F.3d 900, 904 (9th Cir. 2002), the plaintiffs "***remained free at all

20   times to close their account or change their direct deposit instructions.***  Because

21   they did not do so … each deposit to the account after an overdraft should be treated

22   as a voluntary payment of a debt incurred." (emphasis added).  In *Spivey v. Adaptive

23   Marketing LLC*, 622 F.3d 816, 819-20 (7th Cir. 2010), under the terms of

24   defendant's membership agreement, Spivey had the right to terminate this agreement

25   at any time, without consequence.  Like the plaintiffs in *Lopez*, plaintiff Spivey had a

26   clear mechanism and reasonable opportunity to reject the service.  *See id.* at 821.

27

28

Since Plaintiffs had no choice but to pay the CTC to protect their interests (and credit record), they may recover their payments from ADT in this action.

### C. Plaintiffs Adamson and Clark Did Not Pay CTCs with Full Knowledge of the Facts

ADT's claim that Plaintiffs had full knowledge of the facts is baseless. Plaintiffs were charged CTCs and believed that they had a contractual obligation to pay them. *See, e.g.*, UF 49. They could not have known that the CTCs were void under §1671 and unlawful under consumer protection statutes. *See Am. Oil Serv. v. Hope Oil Co.*, 194 Cal. App. 2d 581, 586 (1961) ("[I]t is elementary that an excessive payment made in ignorance of the fact that it is excessive is recoverable."). There is no evidence – and ADT will be hard-pressed to present any – that the Plaintiffs' knew they had and were releasing a statutory right to recover the CTCs. As one court cogently explained:

> [W]e would be disinclined to find a "waiver" unless and until an applicant is shown to have knowingly and unmistakably waived *the very specific statutory rights at issue.* Our Supreme Court has stated the applicable rule in the following words: "[I]t is settled law in California that a purported "waiver" of a statutory right is not legally effective unless it appears that the party executing it has been fully informed of the existence of that right, its meaning, the effect of the "waiver" presented to him, and his full understanding of the explanation." Another court of appeals has written on this point "[t]o constitute a waiver, it is essential that there be an existing right, benefit, or advantage, a knowledge, actual or constructive, of its existence, and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that it has been relinquished."

*Bickle v. City of Piedmont*, 45 Cal. App. 4th 313, 42 Cal. Rptr. 2d 787, 793 (1995) (emphasis added; citations omitted; reversed on other grounds).

Again, ADT's cases are inapposite. In *Salling v. Budget Rent-A-Car Systems, Inc.*, 672 F.3d 442, 445 (6th Cir. 2012), "Salling paid the charge *in anticipation of filing suit* and he received a receipt that enumerated the $13.99 charge in question separately from all other rental charges." Unlike in *Salling*, here, Mr. Adamson

stated that when he paid the CTC he had no intention of filing a lawsuit.  Adamson Dep. 23:4-9, Fisher Ex. I.  Mr. Clark likewise testified that he learned that the CTC was illegal only after his mother paid the fee.  Clark Dep. 61:23-62:10, Fisher Ex. C.

In *Spivey*, the plaintiff asserted "that he paid the charge under a mistake of fact - a recognized exception to the applicability of the voluntary payment doctrine." *Spivey*, 622 F.3d at 823.  But the mistake Spivey alleged had nothing to do with the actions of defendant.  *Id.*  Spivey claimed that he mistakenly believed that the defendant's bills were for a product he did not recognize but assumed his wife had purchased.  *Id.*  Instead of asking his wife, he continued to pay service charges.  *Id.* Here, Plaintiffs did not pay the fees in anticipation of filing suit, and they could not have simply consulted a family member about the legality of the fees.  Indeed, Mr. Adamson sent ADT a check to pay the CTC *before* he learned that he might have a legal claim against ADT.  *See* Adamson Dep. 43:22-44:1, 44:17-45:4, Fisher Ex. I; *see also* Clark Dep. 61:23-62:10, Fisher Ex. C.  ADT fails to meet its burden of showing that the voluntary payment affirmative defense bars Plaintiffs' consumer protection claims.

### D.  Plaintiffs Stanley and Warncke Have Standing

ADT incorrectly claims that being charged a challenged fee does not confer Article III standing.  Mot. at 18.  The obvious injury and remedy available to those who were charged but did not pay the illegal fee is the invalidation of the fee and reversal, or crediting back, of the charge.  *See* 12/4/2008 Statement of Decision, *Ayyad v. Sprint*, Superior Court of Alameda County, Case No. RG03-121510, at 23:12-14, Fisher Ex. J ("For the accounts still in Sprint's possession, the Court orders that ***Sprint must reverse the charges to class members for any charged put unpaid flat ETFs*** and is enjoined from attempting to collect the unpaid flat ETFs from class members." (emphasis added)); *see also* 6/9/2006 Class Certification Order, *In re Cellphone Termination Fee Cases*, Superior Court of Alameda County, J.C.C.P.

4332, at 8:21-25, Fisher Ex. K ("The Court will define the class as all persons who were charged an ETF….***Whether a consumer actually paid the ETF will affect whether the relief will be in the form of money or a declaration that no money is owed***."); *In re Cellphone Termination Fee Cases*, 2008 WL 2332971, at *1 (June 9, 2008) (noting that the trial court granted certification of the ETF Payer Class that consisted of "all California consumers who were *charged or* paid an early termination fee to Defendants …" (emphasis added);  *In re Cellphone Termination Fee Cases*, 186 Cal. App. 4th 1380, 1391 (2010) (noting that the "claim form requires that individuals identify themselves as a customer who 'paid a flat [ETF]," or who "was charged but did not pay a flat [ETF]" and describing the terms of the settlement: "Class members who claim that they paid a flat-rate ETF but are unable to offer any proof of such payment will receive an Allowed Claim of $25, as will members who allege that they suffered harm as a result of having been charged a flat-rate ETF that they did not pay").

ADT half-heartedly suggests that although Plaintiffs may have "statutory standing" they do not have "Article III standing."  *See* Mot. at 17-18.  In support of its contention, ADT states that "the absence of an injury attributable to the defendant's conduct deprives the plaintiff of Article III standing."  *Id*.  But Plaintiffs who were charged, but did not pay, ADT's CTC *do* have an injury *directly attributable to ADT's conduct*: they still owe a CTC unlawfully charged by ADT. As a result, they have been personally injured.  Their injury is not one suffered by "other, unidentified members of the class."  *See* Mot. at 18.

Additionally, as a result of their outstanding CTC charges, Ms. Stanley and Ms. Warncke have suffered further harm.  When Ms. Warncke was asked "what other harm, if any, have you suffered because of ADT," she answered "I've received multiple credit calls, past collection notices, harassing credit agencies of various sorts."  Warncke Dep. 17:16-18, Fisher Ex. D.  Similarly, Ms. Stanley testified that

the outstanding CTC had a negative impact on her credit report.   Stanley Dep. 32:5-10, Fisher Ex. E.  Damage to one's credit score is an objectively identifiable loss under the MCPA.  *Neal v. Residential Credit Solutions, Inc.*, 2013 WL 428675, at *5 (D. Md. Feb. 1, 2013); *see also Townsend v. Nat'l Arbitration Forum, Inc.*, 2012 WL 12736, at *6 (C.D. Cal. Jan. 4, 2012) (stating that allegations of injury relating to credit score reports conferred Article III standing); *White v. Trans Union, LLC*, 462 F. Supp. 2d 1079, 1080-84 (C.D. Cal. 2006) (finding UCL standing where plaintiffs alleged on behalf of a class that TransUnion had "employ[ed] credit reporting practices that they allege falsely declare their discharged debts to be 'due and owing' and thereby inappropriately taint Plaintiffs' credit reports") (cited with approval in *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010)); *Aho v. AmeriCredit Fin. Servs., Inc.*, 2011 WL 2292810, at *2 (S.D. Cal. June 8, 2011) (finding economic injury because "his credit report has been negatively affected by defendant's reporting of the deficiency to credit reporting agencies").

ADT also incorrectly claims that *Delano Farms Co. v. California Table Grape Commission*, 546 F. Supp. 2d 859, 890 (E.D. Cal. 2008) supports the proposition that being charged a challenged fee is insufficient to confer standing.  ADT asserts that, in *Delano Farms*, partial summary judgment was granted "because the plaintiff lacked standing in that it 'never paid [the challenged] assessments."  Mot. at 18.  But the plaintiff that ADT's quote refers to, the Susan Neill Company, "never itself bor[e] the costs of assessment," instead it "always passed the cost of the assessment on to Lucas Brothers Partnership."  *Delano Farms*, 546 F. Supp. 2d at 888.  As such, the Susan Neil Company did not owe the costs of assessment.

Similar to the facts in *Delano Farms*, in *Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 787 (8th Cir. 2012), a third party bank, not the plaintiffs, paid a "yield spread premium," defendant's compensation for bringing plaintiffs' business to the bank, that "accounted for" the "two fees central to [the] case."  *Id.* at 787-88.

Likewise, in *Colapinto v. Esquire Deposition Services, LLC*, 2011 WL 913251, at *2 (C.D. Cal. Mar. 8, 2011), the plaintiff lacked standing because his counsel had paid for the deposition transcripts at issue *on his behalf.*  Thus, it would have been completely inappropriate to award plaintiffs "restitution and disgorgement" of fees paid in connection with the transcripts.  *See id.*  Differently, here, Plaintiffs Stanley and Warncke did not pass the costs along to another individual or entity, and no intermediary paid the CTC on Plaintiffs' behalves.  Instead, their unpaid CTCs are still outstanding.  As such, unlike the plaintiffs in *Delano Farms*, *Calapinto*, and *Hargis*, Plaintiffs Stanley and Warncke are entitled to relief, such as invalidation of the fee and reversal, or crediting back, of the charge.[6]

**E.    Plaintiff Clark Also Has Standing**

In a failed attempt to show that Ms. Clark was not subject to a CTC, ADT incorrectly claims that Ms. Clark's contract "would have been completed in the last millennium."  In fact, Ms. Clark entered into new agreements with ADT in 2006 and in 2010.  UFs 53, 54.  On January 28, 2006, Ms. Clark entered into a Companion Service Agreement with ADT that provided for an emergency response system connected to a pendant that Ms. Clark wore around her neck.  UF 53.  On February 26, 2010, Ms. Clark entered into an Additional Services Rider contract with ADT that incorporated her original services contract.  UF 54.  That contract provided for an extension of the original contract for an unspecified period of years.[7]  UF 55.

---

[6] *Barrows v. Chase Manhattan Mortgage Corp.*, 465 F. Supp. 2d 347, 361 (D.N.J. 2006) is also clearly distinguishable.  There, the plaintiff claimed that defendants imposed excessive fees in connection with foreclosure proceedings.  *Id.* at 352.  The court concluded that when the plaintiff filed her complaint, "her claim was hypothetical, as there was a *possibility* she would have to pay attorneys' fees and costs in order to resolve the foreclosure action.  Now, however, that the foreclosure action has been resolved without her having to pay any attorneys' fees and costs, her claim went from hypothetical to nonexistent."  *Id.* at 354 (emphasis added).  Not only did the plaintiff not pay excessive fees, she did not *owe* the fees at issue at all.

[7] Despite the fact that the Services Rider contained an adhesive provision providing for an extension of the original contract, ADT may dispute that the Services Rider

Mr. Clark testified repeatedly and adamantly that his mother paid a CTC. *See* Clark Dep. 36:20-21, 37:21-22, 38:1-3, 39:1-16, 41:1-7, 130:16-21, 133:18-19, 134: 11-15, Fisher Ex. C. Moreover, contrary to ADT's contention, ADT's records are incomplete and do not establish that ADT never charged Ms. Clark a CTC or that Ms. Clark did not pay the fee. *See* Mot. at 5. The document ADT terms "Clark Billing History" shows payments related to the "ANSC" or Annual Service Charge,[8] made in "Quarterly Billing Payment[s]" and System Installation charges. Harris Decl., Ex. B (Clark Dep. Ex. J). The "Clark Billing History" does not state that a CTC was inapplicable or waived. *Id.* Further, the document does not reflect all payments made by Ms. Clark to ADT. Ms. Clark signed Companion Services contract on January 28, 2006, at a rate of $34.95, but those charges and corresponding payments do not appear in the "Clark Billing History." *Compare* Clark Companion Services Contract, Fisher Ex. L, *with* Harris Decl., Ex. B (Billing History). Additionally, with regard to Ms. Clark's account, Mr. Clark testified that "[a]s my experience in talking with ADT with her service problems, you got a different story every time you talked to ADT." Clark Dep. 51:6-17, Fisher Ex. C. Further, Mr. Clark's "testimony on this issue" does *not* derive solely form conversations with his mother. As mentioned, Mr. Clark regularly called ADT on behalf of his mother. UF 52. Indeed, Mr. Clark, rather than his mother, called ADT to cancel Ms. Clark's ADT service when she moved to assisted living. UF 50. Finally, like Mr. Adamson, Mr. Clark did not know that the CTC charged to his mother was illegal. Clark Dep. 61:23-62:10, Fisher Ex. C.[9]

---

contract extended Ms. Clark's original contract because the period of years box was left blank. But the Services Rider contract contains several blanks. Fisher Decl. Ex. L. Especially given that the underlying facts must be viewed in the light most favorable to Plaintiffs, based on the extension provision a jury could find that Ms. Clark's contract was extended.

[8] *See* Porpora Dep. 265:24-266:7, Fisher Ex. A (defining "ANSC").

[9] Plaintiff did not substitute Plaintiff Michal Clark for former plaintiff Emily Hogan. *See* Mot. 5. In the FAC, Ms. Hogan brought California consumer protection claims

## VI.  SUMMARY JUDGMENT ON THE TILA CLAIM SHOULD BE DENIED

### A.  Plaintiff Llewellyn's TILA Claim Is Not Barred by the Statute of Limitations

ADT erroneously claims that Mr. Llewellyn's TILA claim is time-barred. While it is correct that 15 U.S.C. § 1640(e) provides that any claim for damages under TILA must be brought "within one year from the date of occurrence of the violation," the Ninth Circuit has "clearly establishe[d] that the running of the limitations is suspended until such time as the plaintiff knew or should reasonably have known of the violation." *Yang v. Home Loan Funding, Inc.*, 2010 WL 670958, *5-*6 (E.D. Cal. Feb. 22, 2010) (quotations and citations omitted).[10]

Here, Plaintiff Llewellyn challenges ADT's practice of unilaterally increasing its monthly fees while in the initial term of a contract with its customers.  These price increases are not specifically disclosed at the time a contract with ADT is executed. *See* Slattery Exs. A, F, K, N, and R (customer contracts).  By increasing rates in the midst of an initial contract term, ADT violates TILA's requirement that the total of all payments required to be made under a contract be fully disclosed at the time of its inception.[11]  Although ADT purports to reserve the right to increase charges on its customers during an initial contract term (*see, e.g.*, UF 11, 23), neither Plaintiff

---

[10] because in "August 2011, Defendant unilaterally increased her rate, without the required prior notice."  Corrected First Amended Complaint ("FAC") ¶ 63, Dkt. No. 44.  In the FAC, she sought to represent a California "increased fee" class, which was a distinct class from "The California ETF Class" that Mr. Adamson, as well as Mr. Clark, seek to represent. *Id.* at 68; SAC ¶ 70, Dkt. No. 60.

[10] In addition to a right to statutory relief and damages, TILA also creates a right of rescission and a corresponding remedy of restitution. 15 U.S.C. §1635(a), (b). This right to rescind must be exercised within a three-year period from the date of the transaction. *Id.* at §1635(f).  Because three years did not elapse from the time that Llewellyn entered into contract with ADT in August 2011 and the commencement of this lawsuit, Plaintiff's claims for rescission and restitution under §1635 are timely.

[11] ADT reserves the right to increase its monthly fees only after the contract has been in place for one year.  UF 23.  If the statute of limitations period starts to run at the time the contract is executed, ADT will successfully immunize itself from any TILA claim challenging these practices because ADT does not raise its rates until after the initial year (and therefore the statute of limitation period) has passed.

Llewellyn nor any other class member could possibly have known that ADT would in fact charge them a monthly fee greater than the amount set forth in their term contract *until the time at which ADT charged them a monthly fee greater than the amount set forth in their term contract.*  For Plaintiff Llewellyn that did not occur until October 2012, less than one year before he brought suit.  UF 26.  Plaintiff Llewellyn did not know <u>and could not have known</u> that ADT would increase his rate at all, and if so by how much, until he received a notice of rate increase from ADT in or about October 2012.  *See, e.g.*, UF 23 ("The Llewellyn contract calls out … that ADT *may* increase his monitoring fee after the first year of service …."); UF 27 ("While ADT makes every effort to keep monitoring and service fees low, *at times* we need to reevaluate our rates …").  The statute of limitations did not begin to run on Llewellyn's TILA claims when he entered into a contract with ADT in August 2011 because the relevant TILA violations were not yet ripe.  As explained in *Yang*: "Logic dictates that where, as here, the violation complained of consists of non-disclosure, there can be no notice of the term or terms that were not disclosed until those terms are imposed …."  *Yang*, 2011 WL 670958, at *6.

ADT argues that Llewellyn's claims should have been apparent to him at the time he entered into a contract with ADT because the contract contains a boilerplate provision which purports to reserve ADT's right to increase his fees.  Mot. at 21.  However, that provision, even if read and understood by Llewellyn, did not require ADT to increase Llewellyn's rates.  Llewellyn Dep. 70:2-4, Fisher Ex. F; UF 23.  Indeed, even though that same boilerplate provision is currently set forth in ADT's California contracts, ADT does not increase fees on its California customers during the initial term.  UF 11.  Until ADT actually increased Llewellyn's rates, he could not have asserted a claim based upon ADT's charging him a rate greater than the rate which he contracted for.

In *Plascensia v. Lending 1st Mortgage*, 583 F. Supp. 2d 1090, 1096-97 (N.D.

Cal. 2008), the court refused to dismiss a TILA claim as time-barred. The Court found that, although the contract documents were literally accurate, plaintiffs sought to show that the defendants obscured crucial terms of the mortgage that did not become apparent until after the initial documents were executed. *Id.* at 1097. Based on this alleged obfuscation, the plaintiffs did not have sufficient information to know of their claim based on the contract alone. *Id.* Here, ADT similarly obscured its TILA violations by failing to accurately disclose the actual monthly fees, by purporting to reserve a right to increase fees that it may or may not choose to exercise, and by including this purported reservation in small font, in a nearly illegible boilerplate multi-page form contract. UF 23; Slattery Ex. K (Llewellyn Contract), at 4.

Because the contract did not fully disclose the facts that form the basis of his TILA claims, Llewellyn's limitation period did not begin until he received a notice of rate increase from ADT in October 2012. Accordingly, his claim for damages falls within the one-year limitations period and is timely.

### B. Plaintiff Llewellyn's TILA Claim Is Not Barred by the Voluntary Payment Doctrine

As explained above, the voluntary payment doctrine is not a permissible defense against consumer protection claims. *See, e.g.*, *Gutierrez*, 622 F.Supp. 2d at 955-56. The doctrine should not prevent Mr. Llewellyn from challenging ADT's illegal fee increases because his payments were not voluntarily made with full knowledge of the facts. *See id.* (voluntary payment did not apply where the plaintiff had not "explicitly consented" to the challenged practice; record did not show that the plaintiff was aware of the precise parameters that led to the claim). Mr. Llewellyn "had no choice" other than to pay the increased fees. Llewellyn Dep. 62:8-63:6, Fisher Ex. F. At the time of the fee increase, Mr. Llewellyn did not know and had no reason to know that he had the option of not paying the increased fee because ADT's notice and website concealed the fact that he had a right to refuse to

pay the increase.  *Id.* at 32:16, 62:8-63:6.  Further, Mr. Llewellyn felt compelled to make the payments because he correctly believed he would be subject to a substantial penalty if he terminated early *for any reason*.  *Id.* at 56:23-57:21.  Mr. Llewellyn's payment was not voluntary because a reasonable person in his position would have paid rather than risk being sent to collections, or risk being charged a CTC.  *See Steinman*, 185 Cal. App. 4th at 1558 (considering whether a reasonable person would have made payment to preserve his interests).

### C.    ADT's Increased Fee Provision Is Unlawful

ADT claims that its sale of alarm and monitoring equipment and services is not a "credit" transaction subject to TILA.  Mot. at 15-16.  ADT falsely claims that its position is supported by "undisputed" facts.  Mot. at 1.  These so-called undisputed facts are in fact disputed.  ADT relies wholly on the self-serving deposition testimony of its executives in support of the facts it claims are undisputed.  However, discovery in this case is ongoing, and ADT has brought an early motion for summary judgment.  It is improper for ADT to claim at this stage of the case that facts are undisputed when discovery is continuing and is not closed.  *See James v. UMG Recording, Inc.*, 2012 WL 1376977, at *4 (N.D. Cal. Apr. 19, 2012) (denying summary judgment where discovery was ongoing and plaintiffs had not had full opportunity to gather facts and evidence in opposition).

Plaintiffs specifically allege that the sale of equipment and services constitute credit transactions because customers received equipment and installation at the start of the contract that was worth more than their initial payment, such that they assumed a debt to be paid in monthly installments and have an unconditional obligation to pay ADT.  *See* SAC ¶¶ 167-172; *see Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 366 (1973).  The facts alleged in Plaintiff's SAC have now been confirmed.  ADT controls its dealers' ability to offer discounted equipment, and ADT controls the content of any advertising and rebates/reductions offered by its

dealers.  *See* Fisher Ex. B, ADT0010818-9 (Dealer vs. ADT responsibilities).  ADT runs credit checks on its customers and has established a minimum credit score required to become a customer, providing further indicia that ADT is acting as a creditor.  Porpora Dep. 300:4-13, Fisher Ex. A; Rabaa Dep. 20:19-24, Fisher Ex. S. ADT's monthly fees vary based upon the value of the equipment that is provided. *See* Rabaa Dep. 49:18-24, Fisher Ex. S.  Customers who purchase expensive equipment at a "discount" are charged more per month than customers who purchase less expensive equipment.  Fisher Ex. M, ADTLLC00329545  (describing pricing depending on install).  Notwithstanding ADT's self-serving statements, it is reasonable to infer that the monthly fees paid to ADT are actually, in whole or in part, installment payments on the sale of equipment – monthly installment payments that are intended to compensate ADT for accepting $99 up-front for equipment allegedly worth $850.  Fisher Ex. N (ad for free $850 system for $99 install and purchase of monitoring).  Further, contrary to ADT's assertion, ADT clearly seeks to recoup the value of installation discounts by requiring a long-term contractual commitment for set monthly payments.  *See* Mot. at 16.  In fact, as Mr. Llewellyn testified: when his equipment malfunctioned ADT offered him choice between paying for expensive equipment or entering into a new contract.  Llewellyn Dep. 13:1-7, Fisher Ex. F.  That testimony shows that ADT recoups its initial investment on equipment sold at a discount by requiring that customers pay in monthly installments for the term of the contract.  *See id.*

## VII.  CONCLUSION

For the foregoing reasons, ADT's motion for summary judgment should be denied in its entirety.

1    Dated:  March 14, 2014                **BURSOR & FISHER, P.A**

2

3                                          By:_____*L. Timothy Fisher*_____

4

5                                          L. Timothy Fisher (State Bar No. 191626)
                                           Annick M. Persinger (State Bar No. 272996)
6                                          1990 North California Boulevard, Suite 940
                                           Walnut Creek, CA  94596
7                                          Telephone: (925) 300-4455
                                           Facsimile:  (925) 407-2700
8                                          E-Mail: ltfisher@bursor.com
9                                                      apersinger@bursor.com

10                                         **MORGAN & MORGAN, P.C.**
                                           Peter Safirstein (*pro hac vice*)
11                                         Elizabeth S. Metcalf
                                           28 West 44th Street, Suite 2001
12                                         New York, NY  10001
                                           Telephone:  (212) 273-1135
13                                         Facsimile:   (212) 564-1807
14                                         Email:  psafirstein@forthepeople.com
                                                      emetcalf@forthepeople.com
15

16                                         **MORGAN & MORGAN, P.C.**
                                           Christopher S. Polaszek (*pro hac vice*)
17                                         One Tampa City Center
                                           201 N. Franklin St., 7th Fl.
18                                         Tampa, FL  33602
                                           Telephone:  (813) 314-6484
19                                         Facsimile:  (813) 222-2406
20                                         Email:  cpolaszek@forthepeople.com

21                                         **LAW OFFICE OF JANA EISINGER,
                                           PLLC**
22                                         Jana Eisinger (*pro hac vice*)
23                                         11 West Prospect Avenue
                                           Mount Vernon, New York  10550
24                                         Telephone:  (914) 418-4111
                                           Facsimile:  (914)  455-0213
25                                         Email:  Jana.Eisinger@gmail.com

26                                         **REICH RADCLIFFE & KUTTLER LLP**
27                                         Marc G. Reich (State Bar No. 159936)
                                           4675 MacArthur Court, Suite 550

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Newport Beach, CA  92660
Telephone:  (949) 975-0512
Facsimile:    (949) 975-0514
Email:  mgr@reichradcliffe.com

*Attorneys for Plaintiffs*