1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ADAMSON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ADT, LLC, d/b/a ADT SECURITY SERVICES, <br><br> Defendant. | Case No. CV 12-10558 DMG (PLAx) <br><br> **ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 75]** |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant ADT LLC, d/b/a ADT Security Services, on January 31, 2014 [Doc. # 75]. The Court held a hearing on the Motion on April 4, 2014.  The Court has duly considered the arguments and evidence presented in support of and in opposition to the Motion.  For the reasons discussed below, Defendant's Motion for Summary Judgment is **GRANTED in part and DENIED in part.**

## I.

## PROCEDURAL HISTORY

On September 30, 2014,  Plaintiffs John Adamson, Michal Clark, John Llewellyn, Andrea Stanley, and Jackie Warncke, all current or former customers of ADT, filed a Second Amended Class Action Complaint ("SAC") against ADT raising claims

concerning ADT's Early Termination Fees ("ETFs") and ADT's unilateral price increases.  [Doc. # 62.]  The SAC asserts the following causes of action:  (1) violation of Cal. Civ. Code § 1671; (2) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (3) violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (4) violations of the Maryland Consumer Protection Act, Md. Code, Com. Law § 13-101 *et seq.*; (5) violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; (6) declaratory relief; and (7) unjust enrichment.  [Doc. # 62.]

ADT filed the instant Motion for Summary Judgment as to all causes of action on January 31, 2014.  [Doc. # 75.]  Plaintiffs filed an Opposition on March 14, 2014.  [Doc. # 85.]  ADT filed a reply on March 21, 2014.  [Doc. # 98.]

## II.

## FACTUAL BACKGROUND[1]

There is no material dispute of fact as to the following, unless otherwise noted:

**A.**    **Early Termination Fees**

Currently, all of ADT's customer agreements are two or three year term contracts with a 75% ETF.  (Consolidated Separate Statement of Undisputed Fact and Supporting Evidence ("CSSUF") ¶ 47 [Doc. # 98-1].)   ADT's contracts with John Adamson, John Llewellyn, and Andrea Stanley provide:[2]

> Your early termination of the contract.  You agree that the
>
> charges due under this contract are based on your agreement to

---

[1] ADT makes several evidentiary objections.  The Court only addresses the objections to the extent they relate to material facts upon which the Court relies.

[2] The parties do not cite to an ETF provision in Jackie Warncke's contract, but they do not dispute that she failed to pay the ETF that was assessed when she terminated her contract.  (CSSUF ¶ 32.)  Neither party provides the Court with a copy of Wilma Clark's home security services contract.  ADT's Motion asserts that Clark's 1996 contract had an ETF of 100% (Mot. at 9), but there is no evidence in the record to support this.  ADT also states that Warncke's contract, which was issued by Broadview, a company ADT acquired, had a 100% ETF.  (*Id.*)

receive and pay for the services for . . . years.  Accordingly, you agree that if you terminate this contract during its initial term, you will pay us an amount equal to 75% of the charges to be paid by you during the remaining initial . . . term of this contract."

(CSSUF ¶ 8 (Adamson); ¶ 30 (Llewellyn); ¶ 39 (Stanley).)

**B.      The Parties Dispute Whether ADT's Contracts Provide Hidden Credit.**

Plaintiffs assert that ADT recovers the cost of parts and installation through each month's service payment on ADT's two or three year contracts.  (SAC ¶ 170).    In support of this theory, they provide the following evidence:  (1) an ADT advertisement stating: "Free Home Security System! $850 value at <u>NO COST</u> to you for parts and activation with <u>*only*</u> a $99 Customer Installation Charge and the purchase of alarm monitoring services"  (Declaration of Timothy Fisher ¶ 16, Exh. N [Doc. # 85-1]); (2) testimony by John Llewellyn that when his equipment malfunctioned, ADT offered him the choice between paying for new equipment and labor, or signing a new contract that would cover these costs (Fisher Decl. ¶ 8, Exh. F ("John Llewellyn Depo. 13:1-7") [Doc. # 85-1]); and (3) ADT's contracts, providing that ADT may cancel the contract under certain circumstances, and that if ADT cancels, "ADT will refund any advance payments made for services to be supplied after the date of such termination, *less any amounts still due for the installation of the equipment*, for services already rendered and for any other charges due."  (Declaration of Paul Slattery ¶ 12, Exh. K at pg. 6 pt. 19(A) [Doc. # 75-12] (emphasis added).)

Although Plaintiffs dispute this, ADT contends that the monthly charges cover the ongoing security monitoring service and have nothing to do with installation, labor, or equipment.    They point to testimony by ADT's Chief Financial Officer for the Residential Business Unit that ADT does not recoup savings offered at the beginning of a contract and that the recurring bills during the term of the contract do not change based

on the "installation value."  (Paul Slattery Decl. ¶ 22, Exh. U ("Ken Porpora Depo.") at 304:20-25; 305:1-22 [Doc. # 75-33].)   ADT also proffers testimony by its Manager of Due Diligence in Authorized Dealer Operations that the amount ADT charges for the security equipment and installation has no impact on the monthly monitoring rate. (Paul Slattery Decl. ¶ 20, Exh. S ("Barbara Rabba Depo.") at 114:13-17 [Doc. # 75-20].) Instead, the monthly monitoring rate is "contingent upon the service.  It has nothing to do with the equipment." (*Id.* at 115:18-21.)  Depending on your service, however, you may need certain equipment.  (Timothy Fisher Decl. ¶ 21, Exh. S ("Barbara Rabba Depo.") at 116:19-23 [Doc. # 85-1].)[3]

ADT's "dealer guidelines" outline what a dealer can "charge and what services are included in that rate."  (*Id.* at 49: 8-11.)  These guidelines change when there are "price changes," such as when ADT has "added new equipment."  (*Id.* at 18-24.)  The dealer is an independent business that buys the equipment and can charge "what's reasonable," as long as the dealer charges a minimum of $99.  (Supplemental Declaration of Paul Slattery ¶ 3, Exh. B "(Barbara Rabba Depo.") at 35:21-24 [Doc. # 98-2].)

ADT has a "credit worthiness" system for new customers, but the monthly fee does not vary with the customer's score.  (Ken Porpora Depo. at 300:4-21.)  ADT bills at least some customers in advance of service.  (Fisher Decl. ¶ 6 Exh. D ("Deposition of Jackie Warncke") at 13:2-5; 81:15-19 [Doc. # 85-1].)

---

[3] Plaintiffs assert that Exhibit M to the Fisher Declaration establishes that customers who "purchase expensive equipment at a discount are charged more than customers who purchase less expensive equipment."  (Opp'n at 25.)  There is no indication in the record that Exhibit M is ADT policy, or that it reflects this proposition.

**C.**   **Material Facts Pertaining to Each Plaintiff**

    **1.**   **California Plaintiffs**

        **a.**  **John Adamson**

John Adamson signed a three-year contract with ADT on June 25, 2012.  (Slattery Decl. ¶ 2, Exh. A [Doc. # 75-2].)  In April 2013, Adamson called ADT to terminate his service.  (Slattery Decl. ¶ 3 ("Deposition of John Adamson") at 21:8-24 [Doc. # 75-3].)  At that time, he knew he would be charged an ETF.  (*Id.* at 22:2-5.)  He paid the ETF.  (*Id.* at 23: 1-15.)  Adamson does not allege that ADT ever increased his monthly fee.  (CSSUF ¶ 8.)

        **b.**  **Michal Clark**

Michal Clark is the successor-in-interest in this action to his mother, Wilma Clark, who is deceased.  Wilma Clark signed a home security services contract with ADT in or about July 1996.  (CSSUF ¶ 19.) The parties dispute whether she was ever charged and ever paid an ETF.  According to ADT, Wilma Clark did not pay an ETF and was not charged one.  ADT points to billing records for Clark's Home Security Account, noting that there are no charges to her account after cancellation and no evidence of payment of an ETF at any time.  (Declaration of Kim Harris ¶¶ 5-6, Exh. B [Doc. # 75-23].)  Michal Clark does not dispute that he lacks any documentation that his mother paid the fee.  (*Id.* at 35:17-25.)  There is no evidence that ADT ever charged Wilma Clark a unilateral rate increase.

    **2.**   **Maryland Plaintiffs**

        **a.**  **Andrea Stanley**

Andrea Stanley signed a contract with ADT on May 10, 2008.  (Slattery Decl. ¶ 19, Exh. R [Doc. # 75-19].)  Her rates were never increased.  (CSSUF ¶ 35.)

        **b.**  **Jackie Warncke**

Jackie Warncke signed a three-year contract with Broadview/ADT on May 25, 2010.  (Slattery Decl. ¶ 15, Exh. N [Doc. # 75-15].)  ADT never charged Warncke an

increased fee.  (CSSUF ¶ 35.)  Warncke did not pay the ETF that ADT charged her when she terminated her contract.  (CSSUF ¶ 32.)  Warncke claims that she suffered harm from the ETF charge in the form of "multiple credit calls, past collection notices, harassing credit agencies."[4]  (Fisher Decl. ¶ 6 Exh. D ("Deposition of Jackie Warncke") at 17:16-18 [Doc. # 85-1].)  Under ADT policy, a customer who voluntarily cancels a contract and does not pay the ETF will "30 days later . . . be automatically placed with one of [ADT's] collection agencies."  (Fisher Decl. ¶ 10 Exh. H ("Phil McDevit Depo.") at 45:12-20 [Doc. # 85-1]; CSSUF ¶ 60.)

### 3.  **Georgia Plaintiff**

#### a.  **John Llewellyn**

John Llewellyn signed a three year contract with ADT on August 11, 2011 and is still a customer of ADT and, therefore, he has never paid an ETF.  (CSSUF ¶ 22.)  The parties agree that Llewellyn's contract contains the following provision:

> Increases in Charges.  ADT has the right to increase the annual service charge at any time after the first year.  If I object in writing to the increase within thirty (30) days of receiving notice of the increase, and if ADT does not waive the increase, then I may terminate this Contract effective thirty (30) days after ADT's receipt of my written notice of termination.  In this situation, I will not have to pay the contract termination charges described in Paragraph 2 above [referring to the ETF].

---

[4] ADT objects to this evidence as hearsay and on the basis of the best evidence rule.  The objections are overruled.  This testimony is not hearsay to the extent it is offered as evidence that these incidents occurred and any reasonable inferences to be drawn therefrom—not that Warncke was reported to a credit agency by ADT.

(Slattery Decl. ¶ 12, Exh. K ("Llewellyn Contract") at 4 [Doc. # 75-12].)  In Llewellyn's October 2012 bill, ADT notified him that his rate had increased $1.79 per month. (Slattery Decl. Exh. L [Doc. # 75-13].)

### III.

### STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1986)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  "It is well settled that a non-moving party must present "more than a 'mere . . . scintilla of evidence' to defeat a motion for summary judgment." *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1019-20 (9th Cir. 2013) (*quoting Int'l Church of Foursquare Gospel v.*

*City of San Leandro*, 673 F.3d 1059, 1068 (9th Cir. 2011) (alteration in original) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## IV.

## DISCUSSION

**A.    Article III Standing**

To establish Article III standing, a plaintiff must satisfy a three-part test:  (1) the plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of," i.e., "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1169 (9th Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)) (internal quotation marks omitted), *cert. denied*, 132 S. Ct. 498, 181 L.Ed.2d 388 (2011); *see also Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n. 20, 96 S. Ct. 1917, 48 L.Ed.2d 450 (1976) (named plaintiffs who represent a class must allege and show that they personally have been injured).  The party invoking federal jurisdiction bears the burden of establishing standing for each form of relief sought.  *Lujan*, 504 U.S. at 561.

It is undisputed that Adamson and Llewellyn paid an ETF and an increased fee respectively and, therefore, they have Article III standing.  ADT argues that Stanley and Warncke lack Article III standing because, although each was charged an ETF, they never paid the fees.  ADT also argues that Clark lacks standing because there is no evidence that she ever was charged or paid an ETF.

**1.**     **There is a Triable Issue of Fact Regarding Whether Stanley and Warncke Have Been Injured for Purposes of Article III Standing.**

ADT argues that merely being charged a fee does not constitute injury for purposes of Article III standing.  Plaintiffs respond that Stanley and Warncke have been injured because their failure to pay the ETFs has harmed their credit, and injury relating to their credit reports is sufficient to confer Article III standing.  *See, e.g., Townsend v. Nat'l Arbitration Forum, Inc.*, No. 09-9325, 2012 WL 12736, *6 (C.D. Cal. Jan. 4, 2012) ("injury relating to his credit score reports [is] sufficient to confer Article III standing."); *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 909 (N.D. Cal. 2011) (although not explicitly considering Article III standing, the court exercised jurisdiction over case where plaintiff was charged a fee but it was unclear whether she ever paid it); *Urquhart v. Manatee Mem'l Hosp.*, No. 806-1418T-17, 2007 WL 2010761, *3 (M.D. Fla. July 6, 2007) (bill sent to collections agency sufficient injury for Article III standing); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000) (injury-in-fact for Article III purposes must be "actual or imminent").[5]

Plaintiffs present evidence sufficient to create a triable issue of fact as to whether Stanley and Warncke's credit has been damaged or imminently will be damaged by their failure to pay the charged ETFs:  They did not pay the charged ETFs, and under ADT

---

[5] At oral argument, ADT pointed to cases cited on pages 15 through 17 of its reply brief to argue that Stanley and Warncke lack standing.  The majority of the cases ADT cites do not address Article III standing, but rather standing under the UCL.   Standing under the UCL is "substantially narrower than federal standing under article III."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 324, 120 Cal. Rptr. 3d 741 (2011).  The remaining cases ADT cites concern standing under the Fair Credit Reporting Act, not Article III, or are factually distinguishable nonbinding cases.  None of the cases cited address Article III standing based on injury to credit.  *See, e.g., Delano Farms Co. v. California Table Grape Comm'n*, 546 F. Supp. 2d 859, 890 (E.D. Cal. 2008) (grower lacked standing to seek refunds of past assessments to a commission for which it was already reimbursed); *Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 791 (8th Cir. 2012) (mortgage borrower whose payments could not be traced to allegedly unlawful mortgage fees lacked standing to challenge fees).

policy a customer who voluntarily cancels a contract and does not pay the ETF will "30 days later . . . be automatically placed with one of [ADT's] collection agencies." (Fisher Decl. ¶ 10 Exh. H ("Phil McDevit Depo.") at 45:12-20 [Doc. # 85-1]; CSSUF ¶ 60.) According to Plaintiffs, Warncke has suffered harm from the ETF charge in the form of "multiple credit calls, past collection notices, harassing credit agencies." (Fisher Decl. ¶ 6 Exh. D ("Deposition of Jackie Warncke") at 17:16-18 [Doc. # 85-1].) This evidence creates a triable issue of fact as to whether Stanley and Warncke's credit was harmed by their failure to pay the charged ETFs.

Accordingly, ADT's Motion for Summary Judgment on the ground that the Maryland Plaintiffs lack Article III standing is **DENIED**.

### 2. Wilma Clark Lacks Article III Standing.

ADT argues that Wilma Clark lacks Article III standing because she was never charged nor paid an ETF.   As detailed above, ADT's billing records give no indication that Wilma Clark was charged or paid an ETF.  In response, Wilma Clark's son offers a hearsay statement based on what his mother told him that she did in fact pay an ETF. There is no other admissible evidence in the record showing that Wilma Clark was charged or paid an ETF, such that she sustained an Article III injury-in-fact.  Summary judgment is therefore **GRANTED** as to the claims asserted on behalf of Clark.

### B. The Voluntary Payment Doctrine Does Not Bar Plaintiffs' Claims.

ADT argues that Adamson and Llewellyn voluntarily paid the ETF or the increased rate, and thus their claims are barred by the voluntary payment doctrine.

The voluntary payment doctrine prevents recovery of money by a plaintiff who voluntarily paid with "full knowledge of the facts."  *Am. Oil Serv. v. Hope Oil Co.*, 194 Cal. App. 2d 581, 586, 15 Cal. Rptr. 209 (1961).  A payment made "under protest" is insufficient to make it involuntary.  *Steinman v. Malamed*, 185 Cal. App. 4th 1550, 1558, 111 Cal. Rptr. 3d 304, 309 (2010).  An involuntary payment is one which is made under "duress, coercion, or compulsion, when the payor has no other adequate remedy to avoid

-10-

it." *Id.* (citing *W. Gulf Oil Co. v. Title Ins. & Trust Co.*, 92 Cal. App. 2d 257, 264, 206 P.2d 643, 648 (1949)).  A payment is made under duress where a "reasonably prudent man finds that in order to preserve his property or protect his business interests it is necessary to make a payment of money which he does not owe." *Id.* (citing *W. Gulf Oil Co.*, 92 Cal. App. 2d at 265).

There is a split of authority among district courts on whether the voluntary payment doctrine applies to violations of "statutorily defined public policy," such as the consumer protection violations alleged here.  *See Sobel v. Hertz Corp.*, 698 F. Supp. 2d 1218, 1223-24 (D. Nev. 2010) (collecting cases).  Plaintiffs argue persuasively that the doctrine does not apply at all because the statutory provisions at issue are designed by the legislature to protect consumers and cannot be waived.  It does not appear that any California appellate court or the Ninth Circuit has weighed in on this issue.  Some district courts addressing statutory consumer protection claims appear to assume, without discussion, that the doctrine applies.  *See, e.g.*, *Belle v. Chrysler Grp., LLC*, No. 12-00936, 2013 WL 949484, *8 (C.D. Cal. Jan. 29, 2013); *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 909 (N.D. Cal. 2011); *but see Sobel*, 698 F. Supp. 2d at 1223-24 (voluntary payment doctrine does not apply to statutory consumer protection claims under Nevada law); *Indoor Billboard / Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 86, 170 P.3d 10 (2007) (voluntary payment doctrine does not apply to statutory consumer protection claims under Washington law).

This Court need not decide whether the voluntary payment doctrine applies to statutory consumer claims at this time, because it concludes that even if it did, it does not preclude Adamson or Llewellyn's claims under the circumstances of this case.

### 1.   **Adamson**

Under ADT policy, when a customer voluntarily cancels a contract and does not pay the ETF, "30 days later, if no payment has been recorded in the system, that account will be automatically placed with one of our collection agencies."  (CSSUF ¶ 60.)  Even

without knowledge of this fact, a "reasonably prudent" ADT customer would find it "necessary to make the payment" to prevent referral to a collection or credit agency.  *See Steinman,* 185 Cal. App. 4th at 1558 (quoting *Western Gulf Oil,* 92 Cal.App.2d at 266); *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 909 (N.D. Cal. 2011) ("payment to her credit card company so that she could stay in good standing with creditors while pursuing this action would not bar her claim" under the voluntary payment doctrine).  Because Adamson faced a choice between payment and potential harm to his credit for non-payment of a debt, the Court concludes that the voluntary payment doctrine does not bar his claims.  *See Steinman*, 185 Cal. App. 4th at 1558; *Parino v. BidRack, Inc.*, 838 F. Supp. 2d at 909.

Accordingly, summary judgment is **DENIED** as to Adamson on the basis of the voluntary payment doctrine.

### 2. **Llewellyn**

The SAC raises three claims on behalf of Llewellyn:  (1) violation of TILA—a federal claim; (2) declaratory relief, based in part on the TILA violation and other violations not pertaining to Llewellyn; and (3) unjust enrichment, again based partially on the alleged TILA violation.

ADT summarily asserts that Llewellyn's TILA claim is barred by the voluntary payment doctrine, citing *American Oil Service v. Hope Oil Company*, 194 Cal. App. 2d 581, 584, 15 Cal. Rptr. 209 (1961), a case which involves purely California state law claims.  (Mot. at 20.)  Despite an extensive search, the Court located only one case applying the voluntary payment doctrine to a federal TILA claim.  In *Murry v. America's Mortgage Banc, Inc.*, No. 03-5811, 2006 WL 1647531 (N.D. Ill. June 5, 2006), the Court remarked, without further analysis, that "[t]he voluntary payment defense only bars claims for rescission" under TILA, citing an Illinois state case, which did not involve a TILA claim.  *Id.* at *4 (citing *King v. First Cap. Fin. Servs. Corp.*, 215 Ill.2d 1, 293 Ill.Dec. 657, 828 N.E.2d 1155, 1170 (Ill. 2005)).  As the Court does not find this sole

conclusory statement in a non-binding case persuasive, the Court declines to apply the voluntary payment doctrine, a creature of state law, to a federal TILA claim absent evidence of Congressional intent to permit this type of waiver.

Summary judgment on the basis of the voluntary payment doctrine's application to Llewellyn is **DENIED.**

## C.   Count I on Behalf of Adamson – Violation of Cal. Civ. Code § 1671.

ADT contends that the ETFs, consisting of 75% of the remaining fees in its contracts, are an alternative means of performance as a matter of law and not unlawful liquidated damages provisions under Cal. Civ. Code § 1671. Therefore, they move for summary judgment on Adamson, Llewellyn, and Stanley's ETF claims, because among the five plaintiffs, only these plaintiffs had ETFs of 75%. (Mot. at 9.) Yet, Llewellyn has not been charged or paid an ETF. It is undisputed that he is still a customer of ADT. Moreover, the SAC asserts only the TILA claim on his behalf. In addition, Stanley's claims rest on provisions of the Maryland Commercial Code, and ADT's Motion raises no argument with respect to those provisions. Therefore, the Court's analysis below pertains only to Adamson's claim under Cal. Civ. Code § 1671.

Plaintiffs argue that ADT's ETFs of 75% violate section 1671, which provides in relevant part:

> [A] provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.

Cal. Civ. Code § 1671(d). The question whether a contractual provision is an unenforceable liquidated damages provision is one for the court. *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1314, 27 Cal. Rptr. 3d 797, 802 (2005).

Under the alternative performance doctrine, "a contractual provision that merely provides an option of alternative performance of an obligation does not impose damages and is not subject to section 1671 limitations." *In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 328, 122 Cal. Rptr. 3d 726, 752 (2011) (citing *Garrett v. Coast & S. Fed. Sav. & Loan Assn.*, 9 Cal. 3d 731, 735, 511 P.2d 1197, 1199 (1973)).  "In evaluating the legality of a provision, a court must first determine its true function and operation."  *Id.* at 328; *see also Roden v. AmerisourceBergen Corp.*, 155 Cal. App. 4th 1548, 1570, 67 Cal. Rptr. 3d 26, 46 (2007) (same).  A court must consider whether, when "viewed from the time of making the contract," the contract "realistically contemplates no element of free rational choice."  *Blank v. Borden*, 11 Cal. 3d 963, 971, 115 Cal. Rptr. 31 (1974).  "When it is manifest that a contract expressed to be performed in the alternative is in fact a contract contemplating but a single, definite performance with an additional charge contingent on the breach of that performance, the provision cannot escape examination in light of pertinent rules relative to the liquidation of damages."  *Garrett*, 9 Cal. 3d at 738.

In *Blank*, the California Supreme Court addressed a contract provision providing a party the right to terminate a contract early if she paid a pre-determined fee.   The Court concluded that this clause provided:

> a true option or alternative:  if, during the term of an exclusive-right-to-sell contract, the owner changes his mind and decides that he does not wish to sell the subject property after all, he retains the power to terminate the agent's otherwise exclusive right through the payment of a sum certain set forth in the contract.

11 Cal. 3d at 970.  In contrast, in *Garrett*, the Court examined a charge for late payment of installments on a contract that was imposed by applying an increased rate in the remaining unpaid principal balance.  9 Cal. 3d at 738.  The Court concluded that the

charge was an unlawful penalty because it was an "additional sum [charged] as damages for breach." *Id.*

Although California courts have not squarely addressed the issue before the Court—whether a consumer fixed-term installment contract with an ETF is a liquidated damages clause or an alternative means of performance—federal courts have applied California law in circumstances substantially similar to those before this Court. Having considered the relevant case law, the Court concludes that the 75% ETFs charged by ADT are an alternative means of performance on the contract.

In *Hutchison v. AT & T Internet Services, Inc.*, No. 07–3674, 2009 WL 1726344 (C.D. Cal. May 5, 2009), *aff'd sub nom. Hutchison v. Yahoo! Inc.*, 396 F. App'x 331 (9th Cir. 2010), the court held that an ETF for disconnecting Internet and phone services was not a penalty. The court, relying on *Blank*, held that the plaintiffs had a rational choice when they were "presented with two means of fulfilling their obligations under the Agreement: (1) retain the full year of service for approximately $40 a month, or (2) retain service for less than a year and pay the monthly rate for the service received in addition to the $200 ETF. *Id.* at *5. In *Hutchison*, the ETF was fixed, and the Court held it was not a penalty even though at a certain point the ETF would exceed the remaining monthly fees. *Id.*

Here, because the ETF of 75% is *always* less than the option of paying the contract in full, the Court concludes that, viewed at the point of contracting, the option of paying the ETF was a rational choice. *Blank*, 11 Cal. 3d at 971. For example, paying the 75% ETF would be rational for a customer who moved or decided that for some other reason she no longer needed ADT's services because it would be less expensive than fulfilling her obligations under the full term of the contract. *See Hutchison*, 396 F. App'x at 333, 334 (choice between fulfilling contract or paying ETF rational at time of contract and not a penalty); *see also Schneider v. Verizon Internet Servs., Inc.*, 400 F. App'x 136, 138 (9th Cir. 2010) (same); *In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 329,

122 Cal. Rptr. 3d 726, 752 (2011) ("If this case concerned a Sprint clause that stated customers could terminate term contracts early by paying a fee, then that fee might well be an alternative means of performance.")

Similarly, in *Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179 (W.D. Wash. 2010), the court held that where "[c]ustomers could elect to fulfill their contract in one of two ways—they could pay for service for the full term of the contract or pay the monthly fee for a shorter term plus the ETF—the choice was rational and the ETF was an alternative method of performance. *Id.* at 1185; *see also Minnick v. Clearwire U.S. LLC*, 174 Wash. 2d 443, 450, 275 P.3d 1127, 1131 (2012) (same). The Court noted that "at the time the parties entered the contract, the customer did not know if or when they would cancel their service," thus the choice was rational as evidenced by the fact that some customers had "elected to incur the ETF" while others decided to continue their monthly payments because it was cheaper. *Id.* Here, with a 25% discount, it is always cheaper for ADT customers with a 75% ETF to pay the ETF rather than fulfill their contractual obligations if they wish to exercise the option of terminating the contract early. Therefore, having the choice to incur the ETF of 75% is rational when viewed at the time of contracting.

Plaintiffs argue that *Hutchison* and *Minnick* can be distinguished because there the customers were given the choice between two types of contracts. Besides the term contract with an ETF, a month-to-month contract was an available, albeit more expensive, option. *Hutchison*, 396 F. App'x at 333; *Minnick*, 174 Wash. 2d at 446. Although the Ninth Circuit noted the choice between two contracts as one factor in considering whether the choice was rational, its holding did not rest on this fact, and the analyses of the district courts in both *Hutchison* and *Minnick* did not even consider that the plaintiffs could have chosen another contract. *Hutchison*, 2009 WL 1726344, *5; *Minnick*, 174 Wash. 2d at 1185. Furthermore, in *Blank*, the California Supreme Court determined that a contract which allowed a party to terminate early but pay a fee was not

a penalty, and did not consider whether there was a second contract to which the party could have agreed. The *Blank* Court's analysis rested solely on the contract at hand. 11 Cal. 3d at 970.

Accordingly, the Court finds that ADT's ETFs of 75% are not an unlawful penalty as a matter of law. The Court **GRANTS** the motion for summary judgment on Count I for violation Cal. Civ. Code § 1671 as to Adamson.

**D.** **Count II On Behalf of Adamson - Violations of the CLRA.**

ADT's Motion includes one sentence asserting that Plaintiffs' second cause of action under the CLRA fails because the ETFs are valid. (Mot. at 15.) Although the Court has concluded above that the ETFs are valid alternative performance provisions, Plaintiffs' second cause of action for a violation of the CLRA is not based solely on the ETFs' validity. Plaintiffs also allege that ADT violated Cal. Civ. Code §§ 1770(a)(5), 1770(a)(9), 1770 (a)(14) by failing to adequately disclose the ETFs. ADT's Motion does not address these allegations. The Court therefore **GRANTS** the Motion for Summary Judgment on Adamson's CLRA claims to the extent they are based on charging the ETFs. The Court **DENIES** the Motion to the extent those claims are based on the failure to disclose the ETFs.

**E.** **Counts III, IV, and V - Violations of Cal. Bus. & Prof. Code § 17200 *et seq*.**

The UCL prohibits "unfair competition," which includes "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the . . . prongs." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (citing *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007)). Plaintiffs allege that ADT's conduct violates all three prongs of the UCL. The Court addresses each prong in turn.

### 1.   <u>Count III on Behalf of Adamson - Unlawful Business Practices.</u>

The unlawful prong "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Davis,* 691 F.3d at 1168 (citing *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548 (1999)). "[V]irtually any state, federal or local law can serve as the predicate for an action under section 17200." *Id.* (citing *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.,* 104 Cal. App. 4th 508, 128 Cal. Rptr. 2d 463 (2002)). Because the Court has concluded that the ETFs of 75% are not unlawful penalty provisions, these ETFs also are not unlawful under Section 17200. Plaintiffs' third cause of action for violation of the UCL based on unlawful business practices is limited to the validity of the ETFs.[6]   Therefore, ADT's Motion for Summary Judgment on Plaintiffs' third cause of action is **GRANTED** as to Adamson.

### 2.   <u>Count IV on Behalf of Adamson - Unfair Business Practices.</u>

Conduct is "unfair" under the UCL either if it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," or when the alleged unfairness is "tethered to some legislatively declared policy" or has an "actual or threatened impact on competition." *Davis*, 691 F.3d at 1169-70.   Count IV asserts several allegations relating to the unfairness of the 75% ETFs, which fail on the basis of the Court's conclusion that they are valid alternative performance provisions.  Count IV also alleges that ADT's imposition of unilateral price increases violates the unfair prong of the UCL.  Yet, it is undisputed that Adamson has

---

[6] In the SAC, Plaintiffs also allege that the UCL's unlawful prong is violated based on the violation of TILA.  (SAC ¶ 124.)  Plaintiffs' TILA claim, however, is raised only on behalf of Llewellyn, the Georgia Plaintiff.  (SAC – Count VII pg. 32.)  Plaintiffs' UCL claims are asserted only on behalf of California Plaintiffs Adamson and Clark.  (SAC – Count III pg. 24).   Moreover, the UCL unlawful claim appears to be premised on the ETFs, and the parties agree that Adamson neither paid nor was charged an ETF because he is still a customer.

not been charged nor has he paid an increased rate, and Count IV is raised only with respect to Adamson.  (CSSUF ¶ 8.)

Accordingly, ADT's Motion for Summary Judgment on Count IV is **GRANTED**.

### 3.     Count V on Behalf of Adamson - Fraudulent Business Practices.

"A business practice is fraudulent under the UCL if members of the public are likely to be deceived." *Davis*, 691 F.3d at 1169.  Plaintiffs' allegations that ADT violated the fraud prong of the UCL are summarized as follows:  (1) failing to adequately disclose material information, including the ETFs; (2) failing to disclose that contracts may be extended or an ETF applied if a customer moves prior to the termination of the contract; and (3) charging unlawful ETFs.   ADT moves for summary judgment on Count V on the basis that the 75% ETFs are lawful.  (Mot. at 15.)   It fails to make any arguments regarding adequate disclosure of the ETFs and the other allegations constituting Plaintiffs' fraud claim.

ADT's Motion for Summary Judgment is therefore **GRANTED** on Count V to the extent it is based on the validity of 75% ETFs, and is **DENIED** on Plaintiffs' claims that ADT failed to properly disclose the ETFs and the possible extension of contracts.

### F.     Count VI on Behalf of Stanley and Warncke – Violations of the Maryland Consumer Protection Act.

ADT makes the conclusory assertion that because ADT's ETF of 75% is an alternative means of performance under California law, Plaintiffs' ETF claims on behalf of Stanley and Warncke under Maryland law also fail.  (Mot. at 15.)  Yet, ADT's Motion raises no argument regarding the Maryland claims.  Moreover, Plaintiffs' claims under the Maryland Consumer Protection Act include failure to adequately disclose the ETFs and false advertising—not just the validity of the ETFs.  (SAC – Count VI pg. 29.) Finally, ADT states that it does not challenge the validity of Warncke's ETF, which is 100%.  (Mot. at 9.)

In the absence of briefing on Maryland law, the Court **DENIES** the Motion for Summary Judgment on Count VI.

**G.**     **Count VII on behalf of Llewellyn – Violation of TILA.**

   **1.**     **Llewellyn's TILA Claim is Not Time-Barred.**

Llewellyn alleges that the amount of his payments was not properly disclosed at the time of contracting, as required by TILA, 15 U.S.C. § 1638(6), because ADT unilaterally increased his rates after the first year of his contract.  The parties agree that Llewellyn signed his ADT contract on August 11, 2011, first paid the unilateral price increase in October 2012, and Plaintiffs filed this suit on December 10, 2012.  (Slattery Decl. ¶¶ 12-13, Exh. K, L.)  ADT asserts that the one-year limitations period under 15 U.S.C. § 1640(e) for TILA claims commenced when the contract was signed and thus expired before this suit was filed.  Plaintiffs argue that equitable tolling applies.

A plaintiff may bring a TILA claim "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e).  In *King v. State of California*, 784 F.2d 910 (9th Cir. 1986), the Ninth Circuit described the accrual of claims under TILA and when they are subject to equitable tolling:

> [W]e hold that the limitations period in Section 1640(e) runs from the date of consummation of the transaction but that the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action. Therefore, as a general rule the limitations period starts at the consummation of the transaction. The district courts, however, can evaluate specific claims of fraudulent concealment and equitable tolling to determine if the general rule would be

unjust or frustrate the purpose of the Act and adjust the limitations period accordingly.

*Id.* at 915. "[T]he mere existence of TILA violations and lack of disclosure does not itself equitably toll the statute of limitations." *Garcia v. Wachovia Mortg. Corp.*, 676 F. Supp. 2d 895, 906 (C.D. Cal. 2009) (citing *Hubbard v. Fidelity Federal Bank*, 91 F.3d 75, 79 (9th Cir. 1996) (noting that a contrary rule would toll the limitations period whenever there were improper disclosures).

Plaintiffs assert that the limitations period was tolled until October 2012, when ADT unilaterally raised Llewellyn's monthly rate. They contend that Llewellyn could not have known that ADT *would* increase his rates until it did raise them—the contract provided only that ADT *could* raise the rates. The contract provides: "[A]t times we need to reevaluate our rates due to increasing costs of doing business. Thus ADT contracts allow for periodic increases." (CSSUF ¶ 27.) In addition, ADT reserves the right to increase its monthly fees only after the first year of the contract. (CSSUF ¶ 23.) Plaintiffs therefore argue that if, as ADT asserts, the limitations period commenced on the day the contract was signed, ADT would effectively immunize itself from TILA claims based on rate increases because a plaintiff's TILA claim could never become ripe within the one-year-limitations period.

Because Llewellyn's contract did not state that his rates *would* increase and by how much, he lacked notice that the amount of his monthly payments was inadequately disclosed until ADT increased his monthly payment. As another court in this circuit explained, where "the violation complained of consists of non-disclosure, there can be no notice of the term or terms that were not disclosed until those terms are imposed on the loan." *Yang v. Home Loan Funding, Inc.*, No. 07-1454, 2010 WL 670958, *6 (E.D. Cal. Feb. 22, 2010).

In this case, the Court finds that the limitations period was equitably tolled until October 2012, when ADT first increased Llewellyn's rates. Llewellyn's TILA claim is

therefore timely.  *See Plascencia v. Lending 1st Mortgage*, 583 F. Supp. 2d 1090, 1097 (N.D. Cal. 2008) (declining to apply TILA's limitations period because "while the Note and the Statement are literally accurate, Plaintiffs may be able to show that Defendants obscured crucial terms of the mortgage"); *Yang*, 2010 WL 670958, *5-6 (although TILA violations were "evident on the face of the loan documents . . . plaintiff had no way of discovering those terms  . . . until the wrongful terms were imposed).

Accordingly, ADT's Motion for Summary Judgment on Llewellyn's TILA claim on the basis that it is untimely is **DENIED**.

## 2.      There is a Material Question of Fact Regarding Whether ADT's Contracts Are Consumer Credit Transactions.

TILA mandates certain disclosures by a creditor for "each consumer credit transaction other than an open end credit plan."  15 U.S.C. § 1638(a).  A "consumer credit transaction" under TILA refers to "credit offered or extended to a consumer primarily for personal, family, or household purposes" by a creditor.  12 C.F.R. § 226.2(a)(12).  A creditor is:

> a person who both (1) regularly extends, whether in connection with loans,
> sales of property or services, or otherwise, consumer credit which is payable
> by agreement in more than four installments or for which the payment of a
> finance charge is or may be required, and (2) is the person to whom the debt
> arising from the consumer credit transaction is initially payable . . . .

15 U.S.C. § 1602(g).  Credit is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."  15 U.S.C. § 1602(e).

As this Court outlined in its Order Re Defendant's Motion for Judgment on the Pleadings, a contract need not include a credit transaction on its face to fall within TILA's parameters.  (*see* Order at 5-6 [Doc. # 60] (citing *Mourning v. Family Publ'ns Serv., Inc*., 411 U.S. 356, 366-67, 93 S. Ct. 1652, 36 L. Ed. 2d 318 (1973)).  In *Mourning*, the Supreme Court noted the risk of entities "'burying' the cost of credit in the price of

goods sold" to circumvent TILA.  411 U.S. at 366.  "Thus in many credit transactions in which creditors claimed that no finance charge had been imposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction." *Id.*

The Court has found little guidance regarding when an installment contract constitutes a "consumer credit transaction" under TILA, and the parties fail to cite any case other than *Mourning*, which does not address the question.   Although it does not consider a TILA claim, *People of the State of California v. ADT Security Services, Inc.*, is instructive.  In that case, a California trial court held that ADT's contracts were subject to California's Unruh Act, Cal. Civ. Code § 1801.1, and failed to comply with the Act's disclosure requirements.  *People of the State of California v. ADT Security Services, Inc.*, No. No. 08-01301 (Nov. 6, 2009).  (Declaration of Timothy Fisher in Opposition to Motion for Judgment on the Pleadings, Exh. D [Doc. # 53-5].)  The Court reasoned, after examining California law, that where a party enters a non-cancellable contract payable in installments, the contract is "considered to contain a hidden finance charge . . . [because] a 'promise' has been received by the buyer for which payment can be fully determined and, if paid over a period of time, the buyer is entitled to know whether he or she is paying extra, i.e. a finance charge, for the privilege of paying in installments."  *Id.* at 2. The contracts at issue in *ADT Security Services* were ADT's contracts with ETFs of 75%. *Id.* at 4.  The Court distinguished *Crawford v. Farmers Grp., Inc.*, 160 Cal. App. 3d 1164, 207 Cal. Rptr. 155 (1984), where the installment contract provided one month of coverage for each month an insurance premium was paid—without any obligation to pay or purchase beyond that month—and thus was not governed by TILA  *Id.* at 2.

In *Odier v. Hoffmann School of Martial Arts, Inc.*, 619 F. Supp. 2d 571 (N.D. Ind. 2008), the Court held that an installment contract for classes constituted a credit transaction under TILA because students could receive classes before payment.  *Id.* at 580.  It also noted that the plaintiff could not cancel the contract and stated in *dicta* that

-23-

the ability to cancel an agreement "may be . . . what distinguishes between agreements that do extend credit and those that do not under the Truth in Lending Act." *Id.* at 581. In asserting this proposition, it looked to insurance premiums, noting that under 12 C.F.R. § 226, otherwise known as Regulation Z (which implements the Truth in Lending Act, *see* 12 C.F.R. § 226.1 (a)), "[i]nsurance premium plans that involve payment in installments with each installment representing the payment for insurance coverage for a certain future period of time" is not subject to TILA—"unless the consumer is contractually obligated to continue making payments." *Id* (citing 12 C.F.R. 226, supplement 1, F.R.R.S. 6-1162.1).

Plaintiffs proffer sufficient evidence to create an inference that ADT's contracts involve "consumer credit transactions" under TILA.  If ADT cancels the contracts, "ADT will refund any advance payments made for services to be supplied after the date of such termination, *less any amounts still due for the installation of the equipment*, for services already rendered and for any other charges due." (Slattery Depo. ¶ 12, Exh. K at pg. 6 pt. 19(A) [Doc. # 75-12] (emphasis added).)   In addition, when his equipment failed, Llewellyn was offered the choice between paying for new equipment and labor for installation, or signing a new "longer term" contract that would cover "the installation of that new equipment."  (Fisher Decl. ¶ 8, Exh. F ("John Llewellyn Depo. 13:1-7, 19-23 [Doc. # 85-1].)[7]  Finally, even if Plaintiffs cancel their contract, they are required to pay an ETF—their obligations do not terminate when they decide to stop receiving monthly security monitoring from ADT.  *See Odier*, 619 F. Supp. 2d at 580; *Crawford*, 160 Cal. App. 3d at 1170.

---

[7] Drawing all reasonable inferences in favor of Plaintiffs, the Court finds that this fact creates at least an inference that the monthly fees are not limited to monitoring costs and also include, at least in some cases, installation and equipment.  If there were no relationship between the monthly fee and the cost of installation and equipment, ADT could have simply replaced Llewellyn's failed equipment and continued with the existing contract.

During oral argument, ADT argued that there was no evidence that ADT's contracts bury consumer credit transactions, pointing to testimony by Barbara Rabba that ADT's monitoring fee is the same whether or not an independent dealer or ADT provides the equipment. (CSSUF ¶ 41.) As noted above, under ADT policy, ADT dealers can charge "what's reasonable," as long as the dealer charges a minimum of $99. (Supplemental Declaration of Paul Slattery ¶ 3, Exh. B "(Barbara Rabba Depo.") at 35:21-24 [Doc. # 98-2].)  Given the above evidence, the Court concludes that there is a material dispute of fact such that a reasonable jury could find that ADT's contracts involve a consumer credit transaction.[8]

ADT's Motion for Summary Judgment is **DENIED** to the extent it is based on the argument that its contracts are not subject to TILA.

### 3.      There is a Triable Issue of Fact Regarding Whether the Increased Fee Provision Violates TILA.

TILA mandates that for "each consumer credit transaction other than under an open end credit plan," a creditor must make various disclosures, including the number, amount, and due dates or period of payments scheduled to repay the total of payments. 15 U.S.C. § 1638(a)(6); 12 C.F.R. § 226.18(g).   The SAC alleges that ADT failed to adequately disclose the amount of Llewellyn's payments. (SAC ¶ 176.)   Llewellyn's contract did not state that his rate would necessarily increase or by how much.  (*Id.* ¶ 179; Slattery Depo. ¶ 12, Exh. K [Doc. # 75-12].)  ADT argues that its increased fee provision is "lawful as a matter of law" because it is straightforward and allows the customer to

---

[8]  During oral argument, ADT also argued that Defendant's Uncontroverted Fact # 42 is undisputed and warrants summary judgment.  In Uncontroverted Fact # 42, ADT states that "ADT's monitoring fee is the same whether or not the customer pays the entire contract up front or month to month," citing Pope Depo. at 109:16-23 [Doc. # 75-21].)    In the cited testimony, Pope stated that customers are not currently offered discounts for paying all of their charges up front and he does not know whether customers have ever been offered such discounts.  (*Id.*)  Regardless, given Plaintiffs' countervailing evidence, the Court concludes that there is a material dispute of fact as to whether the contracts bury hidden credit.

object to the increase and cancel the contract with no fee.  (Mot. at 13.)  Yet, these arguments appear to focus on whether Plaintiffs can show violations of Cal. Bus. & Prof. Code § 17200.  (*See* Mot. at 13-14.)  ADT does not address why the unilateral fee increase provision is valid under TILA, except to argue that TILA does not apply because the contracts do not involve credit.  (Mot. at 15-16.)

Because the Court has determined that there is a material dispute of fact as to whether ADTs contracts are subject to TILA, and ADT presents no other arguments regarding the merits of Llewellyn's TILA claim, the Court **DENIES** summary judgment on the TILA claim to the extent it is based on the unilateral price increase.

ADT also moves for summary judgment on the TILA claim on the basis that Llewellyn was never charged an ETF.  (Mot. at 20-21.)  Plaintiffs fail to address this argument in their Opposition (Opp'n 21-25), and appear to concede it:  They characterize Llewellyn's TILA claim as limited to the unilateral price increase.  (*Id.* at 21.)  Summary judgment is therefore **GRANTED** on Llewellyn's TILA claim to the extent it is based on payment of an ETF.

## H. Count VIII (Declaratory Relief) and Count IX (Unjust Enrichment) on Behalf of All Plaintiffs

Plaintiffs' claims for declaratory relief and unjust enrichment are premised on the legality of the ETFs and the unilateral price increases.  Due to the Court's determinations above, the Motion for Summary Judgment on the declaratory relief and unjust enrichment claims is:  (1) **DENIED** to the extent these claims for relief are based on ADT's unilateral price increases; (2) **GRANTED** to the extent they are based on the ETFs in Adamson and Llewellyn's contracts; and (3) **DENIED** as to the ETF claims under Maryland law.

# V.

## **CONCLUSION**

In light of the foregoing, the Court orders as follows:

1.     Summary Judgment is **GRANTED** on Clark's claims due to lack of Article III standing;

2.     Summary judgment is **GRANTED** on the first cause of action for violation of Cal. Civ. Code § 1671 as to Adamson;

3.     Summary judgment is **GRANTED** on the second cause of action as to Adamson for violations of CLRA based on legality of the ETFs of 75% and **DENIED** on Adamson's claims that ADT violated the CLRA, Cal. Civ. Code §§ 1770(a)(5), 1770(a)(9), 1770 (a)(14), by failing to adequately disclose the ETFs;

4.     Summary judgment is **GRANTED** on the third cause of action for violation of the unlawful prong of UCL, Cal. Bus. & Prof. Code § 17200 *et seq*. as to Adamson;

5.     Summary judgment is **GRANTED** on the fourth cause of action for violation of the unfair prong of UCL, Cal. Bus. & Prof. Code § 17200 *et seq*. as to Adamson;

6.     Summary judgment is **GRANTED** on the fifth cause of action for violation of the fraud prong of the UCL, Cal. Bus. & Prof. Code § 17200 *et seq*. as to Adamson's claim that the ETFs of 75% are invalid and **DENIED** on Adamson's claims that ADT failed to properly disclose the ETFs and the possible extension of contracts;

7.     Summary judgment is **DENIED** on the sixth cause of action on behalf of Stanley and Warncke for violations of the Maryland Consumer Protection Act;

-27-

8.     Summary judgment is **DENIED** on the seventh cause of action on behalf of Llewellyn for violations of the Truth in Lending Act, 15 U.S.C. § 1601, on unilateral fee increases and **GRANTED** on ETFs of 75%;

9.     Summary judgment is **GRANTED** on the eighth cause of action for declaratory relief as to the validity of the 75% ETF fees as to Adamson and Llewellyn, and is **DENIED** on all other grounds;

10.     Summary judgment is **GRANTED** on the ninth cause of action for unjust enrichment as to the validity of the 75% ETFs as to Adamson and Llewellyn, and is **DENIED** on all other grounds;

11.     The Motion to Dismiss [Doc. # 64] is **DENIED** as moot; and

12.     The Parties shall meet and confer to stipulate to a supplemental briefing schedule on Plaintiffs' causes of action regarding failure to disclose under the CLRA and UCL.  The Parties supplemental briefs shall be no more than 10 pages in length, exclusive of declarations, exhibits, and supplemental statements of uncontroverted facts or genuine disputed issues.

**IT IS SO ORDERED.**

DATED:    April 7, 2014

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE